Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/20/2025 09:08 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
FELIPE N. GONZALEZ VAZQUEZ, APPELLANT.

___ N.W.3d ___

Filed June 20, 2025.    No. S-22-495.

1. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion.
2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
4. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
5. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.
6. ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
7. **Effectiveness of Counsel: Records: Appeal and Error.** The record on direct appeal is sufficient to conclusively determine a claim of

ineffective assistance of counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

8. ____: ____: ____. An ineffective assistance of counsel claim will not be addressed on direct appeal if the record is insufficient to address it.

9. **Criminal Law: Motions for Mistrial.** A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

10. **Motions for Mistrial: Appeal and Error.** An appellate court reviews rulings on motions for mistrial for an abuse of discretion.

11. **Motions for Mistrial: Juries: Appeal and Error.** Where a motion for mistrial is premised on adducing evidence that violates an order in limine, an appellate court will consider that the trial judge was in the best position to assess the potential impact of such evidence on the jury.

12. **Motions for Mistrial: Proof: Appeal and Error.** To prove error predicated on the failure to grant a mistrial, a defendant faces a higher threshold than merely showing a possibility of prejudice. The defendant must prove the alleged error actually prejudiced him or her.

13. **Rules of Evidence: Words and Phrases.** Under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016), relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

14. **Evidence: Proof.** The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing.

15. **Homicide: Evidence: Intent.** Evidence of lack of remorse is relevant to the issue of whether a killing is done purposely and with deliberate and premeditated malice.

16. **Constitutional Law: Criminal Law: Jury Trials: Appeal and Error.** Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.

17. **Constitutional Law: Jury Trials: Appeal and Error.** In a criminal jury trial, although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his or her constitutional right to a public trial by an impartial jury.

18. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any

issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

19. ____: ____: ____: ____. To raise an ineffective assistance of counsel claim on direct appeal, the defendant must allege deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

20. **Effectiveness of Counsel: Proof: Appeal and Error.** When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

21. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

22. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

23. ____: ____. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

24. **Proof: Words and Phrases.** A reasonable probability is a probability sufficient to undermine confidence in the outcome.

25. **Effectiveness of Counsel: Proof.** A court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either.

26. **Effectiveness of Counsel: Trial: Appeal and Error.** When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics.

27. **Effectiveness of Counsel: Presumptions: Appeal and Error.** There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.

28. **Effectiveness of Counsel: Appeal and Error.** In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may consider the strength of the admissible evidence relating to the controverted issues in the case.

29. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

30. **Criminal Law: Trial: Prosecuting Attorneys.** Prosecutors have a duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial and may not inflame the jurors' prejudices or excite their passions against the accused. This rule includes intentionally eliciting testimony from witnesses for prejudicial effect.

31. **Trial: Homicide: Photographs.** Gruesome crimes produce gruesome photographs, and photographs illustrating a controverted issue in a homicide case are admissible even if gruesome, so long as the probative value is not outweighed by the prejudicial effect.

32. **Juries: Prosecuting Attorneys.** Prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities or personal attributes of the victim, unless such facts are relevant to the criminal prosecution.

33. **Trial: Attorneys at Law: Evidence.** A party is allowed considerable latitude in making an opening statement, and it is permissible for the State to discuss what the evidence may show.

34. **Effectiveness of Counsel.** Trial counsel cannot be ineffective for failing to make a meritless motion, objection, or argument.

35. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

36. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** The term "interrogation" under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.

37. **Right to Counsel: Self-Incrimination.** If a suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.

38. ____: ____. To require cessation of custodial interrogation, the invocation of the right to counsel must be unambiguous and unequivocal.

39. **Miranda Rights: Police Officers and Sheriffs: Self-Incrimination.** The desire to cut off questioning must be made with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.

Ambiguous or equivocal statements that might be construed as invoking the right to silence do not require the police to discontinue their questioning.

40. **Right to Counsel: Self-Incrimination.** It is a mixed question of law and fact whether there has been an unambiguous invocation of the right to remain silent or to have counsel.

41. **Self-Incrimination: Police Officers and Sheriffs: Appeal and Error.** In determining whether there has been a clear invocation of the right to remain silent, an appellate court reviews the totality of the circumstances surrounding the statement in order to assess the words in context. Relevant facts include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation.

42. **Trial: Rules of Evidence: Police Officers and Sheriffs.** Statements made by law enforcement in a recorded interview that implicate the defendant's credibility are not categorically inadmissible. Instead, they are to be analyzed under the ordinary rules of evidence, particularly Neb. Rev. Stat. §§ 27-401 and 27-403 (Reissue 2016).

43. **Jury Instructions: Police Officers and Sheriffs.** Upon request, a defendant is entitled to a limiting instruction that statements by law enforcement officers on the veracity of the defendant or other witness are to be considered only for the permissible purpose of providing context to the defendant's statements in an interview.

44. **Criminal Law: Rules of Evidence: Other Acts.** In a criminal case, Neb. Evid. R. 404(1), Neb. Rev. Stat. § 27-404(1) (Cum. Supp. 2024), operates as a broad exclusionary rule of relevant evidence that speaks to a criminal defendant's propensity to have committed the crime or crimes charged. Meanwhile, rule 404 operates as an inclusionary rule of evidence by providing that evidence that raises a propensity inference is admissible for other proper purposes, including proof of motive, intent, preparation, or absence of mistake or accident.

45. **Rules of Evidence: Other Acts: Words and Phrases.** Evidence that is offered for a proper purpose under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024), is often referred to as having "special" or "independent" relevance, meaning its relevance does not depend upon its tendency to show propensity.

46. **Criminal Law: Rules of Evidence: Other Acts: Proof: Evidence.** Under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024), proof of another distinct substantive act is admissible in a criminal prosecution when there is some legal connection between the two

upon which it can be said that one tends to establish the other or some essential fact in issue. In other words, evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question.

47. **Rules of Evidence.** An admission showing consciousness of guilt falls outside the scope of Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024).

48. **Witnesses.** It is generally improper for a witness to testify as to the credibility of another witness.

49. **Prosecuting Attorneys: Witnesses.** It is improper for a prosecutor to inquire of a witness whether another person may or may not be telling the truth.

50. **Juror Qualifications: Parties.** During voir dire, parties may generally ask hypothetical questions designed to determine whether prospective jurors' preconceived attitudes or biases would prevent them from following the law or applying a legal theory or defense.

51. **Juror Qualifications: Attorneys at Law.** Counsel may not use voir dire to preview prospective jurors' opinions of the evidence that will be presented. Nor may counsel secure in advance a commitment from prospective jurors on the verdict they would return, given a set of hypothetical facts.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Stacy M. Foust for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

Felipe N. Gonzalez Vazquez (Vazquez) fired multiple gunshots during a standoff with law enforcement officers. Two officers were injured in the shooting, and one officer died from his injuries. Vazquez was charged with first degree murder and other related felonies, and a jury found him guilty on all counts. He was sentenced to prison.

In this direct appeal, Vazquez assigns error to several rulings by the trial court, argues that cumulative error entitles him to a new trial, and argues that the evidence was insufficient to support two of his convictions. Additionally, Vazquez asserts 17 claims of ineffective assistance of trial counsel. We affirm his convictions and sentences.

## I. FACTS

### 1. Standoff

On August 26, 2020, Lincoln police investigator Luis Mario Herrera and seven other law enforcement officers went to a residence in Lincoln, Nebraska, to arrest 17-year-old Vazquez on two warrants. One was for escaping from a juvenile institution, and the other was for felony assault relating to a stabbing death in March 2020.

When the officers arrived at the residence, Vazquez' stepmother gave them permission to enter. Once inside the residence, officers learned that Vazquez had locked himself inside a ground floor bedroom. Officers informed Vazquez, through the bedroom door, that they were there to arrest him on a felony warrant. Vazquez refused to come out of the bedroom. For safety, officers removed Vazquez' family from the residence during the standoff.

Some officers remained inside the residence and tried to coax Vazquez out of the bedroom, while other officers were stationed outside the residence. During the standoff, Vazquez repeatedly asked officers inside the residence how many officers were present at the scene. Officers stationed outside the residence could see there were two individuals inside the bedroom—one was Vazquez and the other was later identified as Orion Ross.

Officers knew that Vazquez had a cell phone with him in the bedroom and was using it to communicate with people outside the residence during the standoff. Because officers suspected that Vazquez was soliciting others to interfere with the impending arrest, additional officers were called to the scene,

nearby traffic was shut down, and an elementary school across the street was placed in "lockdown." Several officers, including Herrera and Cole Jennings, positioned themselves outside the residence in a location where they could monitor the bedroom window, using a tree and nearby vegetation for cover.

Approximately 30 minutes into the standoff, Ross threw a ceramic mug through the bedroom window, after which Ross and Vazquez both climbed through the broken glass. Ross immediately ran away, while Vazquez fired a total of three shots from a .45-caliber gun before also running away. Jennings was standing next to the tree and holding a police shield when he heard the glass break, and he took cover behind the tree and returned fire. Ross and Vazquez ran from the scene, and neither was shot.

Both Jennings and Herrera were injured in the shooting. Jennings sustained injuries to his shins, and Herrera was struck in the chest by the first shot fired by Vazquez. The bullet passed through Herrera's body, causing severe internal injuries, and he died from his injuries 12 days later.

Herrera's police-issued recording device captured the sounds of breaking glass, firing guns, Herrera's audible response to being shot, and the response of other officers coming to Herrera's aid. A portion of that audio recording was offered and received at Vazquez' trial and will be discussed in more detail later in the opinion.

After the shooting, Ross was quickly apprehended by law enforcement on the elementary school playground across the street. Vazquez was eventually discovered hiding inside the enclosed porch of a nearby residence, and he was taken into custody. Drone footage of Vazquez' arrest was offered and received at trial without objection.

While hiding on the porch, Vazquez placed the .45-caliber handgun inside a glove and hid it in a tool bucket, where it was eventually discovered by police after his arrest. The gun had Vazquez' blood on it, and there was evidence that Vazquez' right hand was bleeding when he was taken into

custody. It is generally undisputed that the gun used by Vazquez in the shooting was stolen from Ross' stepfather in July 2020 and that Vazquez knew it was stolen.

## 2. Postarrest Interview

After Vazquez was taken into custody, he was interviewed by Sgt. Michael Hipps of the Lancaster County sheriff's office. That interview was recorded and admitted into evidence at trial. When the video of the interview was published to the jury, a written transcript was provided as an aid.

During the recorded interview, Vazquez admitted that before climbing out the bedroom window, he saw a "guy with [a] shield" standing by the corner of the residence and another officer by the tree. But Vazquez denied having a gun or firing any shots during the standoff. Other facts relevant to the recorded interview will be discussed later in the opinion.

## 3. Charges and Pretrial Motions in Limine

Vazquez was charged with first degree murder, two counts of use of a firearm to commit a felony, attempted assault on an officer, possession of a firearm by a prohibited person, possession of a stolen firearm, and escape using deadly force or a deadly weapon. He entered pleas of not guilty to all charges.

Vazquez filed multiple pretrial motions, including motions in limine seeking to prohibit testimony about (1) Vazquez' gang membership or activities and (2) the nature of the arrest warrants that were being executed at the time of the standoff. At the hearing on these motions, evidence was introduced showing that Vazquez was a member of the "No Name Demons" or "NND" gang.

The district court sustained both motions in limine and entered an order precluding testimony about Vazquez' gang affiliation. The order also generally precluded testimony about the specific nature of either of the arrest warrants being served at the time of the standoff, but it clarified that the State would be allowed to refer more generally to the arrest warrants as "felony warrants" or "warrants for a serious crime."

### 4. Jury Trial

Over the course of an 11-day jury trial, approximately 50 witnesses testified and hundreds of exhibits were received into evidence. In addition to the facts recited above, evidence was adduced regarding various accounts of the shooting and statements made by Vazquez both before and after the shooting. We discuss only that evidence which is necessary to address the assignments of error raised on appeal, and we expand on some of that evidence later in the analysis.

#### (a) Accounts of Shooting

##### (i) Vazquez' Cellmate

A cellmate who was housed with Vazquez for approximately 2 weeks in February 2021 testified that Vazquez talked with him about the shooting. According to the cellmate, Vazquez said that when he got to the bedroom window, he saw an officer standing outside who was "pointing his gun at him." He said that the officer was "standing in front of him in front of the window" and that he "looked at the officer and fired two shots." Vazquez also said that he "looked at the cop and it was either [me] or the cop," so he fired the gun. Vazquez told the cellmate that he also saw another officer with a shield in the area. Vazquez said that after he fired the shots, he heard screams of pain.

At trial, Vazquez admitted making these statements to the cellmate, but claimed he just was trying to appear tough because he was scared and did not want to be perceived as a "kid" or someone to be "messed with."

##### (ii) Vazquez' Testimony

Vazquez testified in his own defense at trial. He did not deny possessing or shooting the gun during the standoff. He said that while he and Ross were locked inside the bedroom, they were planning their escape. Vazquez testified that he told Ross:

> I'm like, Bro, you have to break the window, I'm going to shoot at the tree, and by then when they hear gunshots they're going to be scared, they going to run for cover,

and by then when they look back up, we're nowhere in sight, you know, we're down the street.

Vazquez testified that before climbing out of the bedroom window, he cocked the gun to make sure there was a bullet in the chamber. According to Vazquez, he fired the gun, intending to scare the officers, not shoot them, but he also said:

[W]hen I started aiming towards the tree, everything just happening so fast, it just felt like five to four seconds, you know, it was just everything is happening so quick.

Like someone came around the tree and I'm like, oh, boom, and I shot, it just felt like a cannon had left my hand, and then it was just like, oh, and I squeezed it again, boom, it just popped again, and I just remember . . . as we're jumping out the window there's shots coming from the left side. I hear someone screaming, you know, I'm just like, oh, I just — I just — I just know something bad happened. And, you know, we just kept running.

Vazquez admitted that when he was interviewed immediately after his arrest, he lied to police and denied having or shooting a gun. But he testified that at the time, he was still trying to "believe what happened really happened."

### (iii) Ross' Testimony

Ross testified at trial pursuant to a proffer agreement with the State. According to Ross, he and Vazquez devised a plan to escape through the bedroom window and run to a nearby cemetery, where they had arranged for an acquaintance to pick them up. Vazquez retrieved a gun that was hidden in a pillowcase, then he cocked the gun and went to the bedroom window. Ross looked out the window and saw a single officer with a shield crouching on the right side of the tree. Ross threw a heavy ceramic mug to break the window, and he saw Vazquez draw the gun and point it toward the window. Ross did not recall hearing any shots being fired, but he did hear someone yelling in pain.

Ross denied ever hearing Vazquez say that he would shoot at police if they tried to arrest him, but he remembered

Vazquez asking him, before going out the bedroom window, "Can I shoot out?" to which Ross replied, "'What you do is what you do.'" When Ross was asked on cross-examination whether he believed that Vazquez fired the gun because he "wanted to scare law enforcement," Ross responded, "Yeah."

### (b) Motions for Mistrial

Vazquez made two motions for mistrial, both premised on alleged violations of the court's order in limine prohibiting testimony about the nature of the specific crimes underlying the warrants being executed at the time of the standoff.

### (i) First Motion

Ross' girlfriend, Mayte Brown, was called as a prosecution witness at trial. Brown testified that approximately 3 months before the standoff, Vazquez told her that if he ever got "picked up on a prior incident" then "he would shoot at police, or try to kill them." Brown did not elaborate on the nature of the prior incident, but she did say that Vazquez "wasn't worried about getting picked up" because "someone else was charged with that."

On cross-examination, Brown reiterated that Vazquez told her "if he was caught for prior incidents that he would shoot at police." When defense counsel asked Brown to clarify when this conversation took place, Brown responded, "I'm not sure of exact dates. I know it was after the first stabbing occurred earlier in the year, and months before the shooting occurred." Defense counsel requested a sidebar and, outside the presence of the jury, objected to Brown's response as a violation of the court's order in limine. Defense counsel argued that it would be "very easy for the jury to draw" a connection between Vazquez' arrest warrant and Brown's reference to the "first stabbing." Defense counsel asked that Brown's response be stricken and that the jury be instructed to disregard it. She also moved for a mistrial, asserting, "I don't think we can un-ring this bell." The court overruled the objection and all related motions.

### (ii) Second Motion

As stated, Ross was called as a prosecution witness at trial. On cross-examination, Ross testified that Vazquez locked the bedroom door after officers knocked, identified themselves, and said they were there on a warrant. Defense counsel asked Ross for the "exact words" used by the officers, and he responded, "Like, it's LPD, and they have a warrant for [Vazquez], for a second degree assault." Counsel continued with cross-examination, but at the next break, she moved for a mistrial outside the presence of the jury, arguing that Ross' reference to "second degree assault" marked the second time a witness had violated the order in limine prohibiting reference to the specific nature of the warrants.

The State opposed mistrial and argued that the witness had only mentioned the nature of the warrant in response to defense counsel's question asking him for the officer's exact words. Defense counsel explained that, based on transcripts of the encounter at the bedroom door, she expected Ross to give a different answer. The trial court overruled the motion for mistrial.

### 5. Guilty Verdicts and Sentencing

The jury returned guilty verdicts on all seven charges. The court accepted the verdicts and found Vazquez guilty of first degree murder, two counts of use of a firearm to commit a felony, attempted first degree assault on a peace officer, possession of a firearm by a prohibited person, possession of a stolen firearm, and escape using force or a deadly weapon. The judge requested preparation of a presentence investigation report and set the matter for sentencing.

At the sentencing hearing, the judge acknowledged receiving and reviewing the presentence investigation report, which included a psychological evaluation of Vazquez and a sentencing letter from defense counsel that will be discussed later in the opinion. After considering sentencing remarks and allocution, the court sentenced Vazquez to imprisonment

for a term of not less than 70 years nor more than life on the first degree murder conviction. On the remaining convictions, Vazquez was sentenced to indeterminate prison terms as follows:

• 15 to 20 years for each of two counts of use of a firearm to commit a felony;
• 20 to 30 years for attempted first degree assault on an officer;
• 5 to 10 years for possession of a firearm by a prohibited person;
• 5 to 10 years for possession of a stolen firearm; and
• 4 to 6 years for escape using force or a deadly weapon.

The sentence for possession of a stolen firearm was ordered to be served concurrently to the other sentences, and the remaining sentences were all ordered to be served consecutively.

Vazquez filed this direct appeal, represented by new counsel.

## II. ASSIGNMENTS OF ERROR

Vazquez assigns, consolidated and restated, that the district court erred in (1) denying both motions for mistrial, (2) admitting certain testimony from Vazquez' father, and (3) accepting the guilty verdicts when there was insufficient evidence to support the convictions involving Jennings. Vazquez also assigns that "[c]umulative [e]rror" deprived him of his constitutional right to a fair trial.

Additionally, represented by new counsel on direct appeal, Vazquez asserts that his trial counsel was constitutionally ineffective in the following 17 respects:

(1) failing to object to the State's unduly emotional and inflammatory evidence and argument,

(2) failing to redact or seek suppression of portions of Vazquez' recorded interview,

(3) failing to object to evidence and argument regarding Vazquez' character,

(4) asking Vazquez improper questions about the veracity of other witnesses and failing to object to the State's doing the same,

(5)  failing to object to a gang reference in an exhibit,
(6)  failing to safeguard attorney work product,
(7)  failing to object during voir dire when the State questioned prospective jurors about evidence that was to be presented,
(8)  making an ineffective opening statement,
(9)  failing to object to the improper evidence and argument relating to the amount of force used to locate and arrest Vazquez,
(10) failing to impeach Brown's credibility with evidence of impaired memory,
(11) failing to impeach Brown's credibility with evidence of bias relating to pending criminal charges,
(12) failing to use information supplied by Vazquez to impeach Brown,
(13) adducing adverse testimony from Brown,
(14) adducing adverse testimony from Ross,
(15) providing unreasonable advice about the right to testify and not to testify,
(16) failing to object when the State questioned Vazquez about his employment status, and
(17) failing to present adequate evidence and argument at the sentencing hearing.

### III. STANDARD OF REVIEW

[1] An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion.[1]

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining

---

[1] *State v. Lenhart*, 317 Neb. 787, 11 N.W.3d 661 (2024); *State v. Haynie*, 317 Neb. 371, 9 N.W.3d 915 (2024).

admissibility.[2] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[3]

[4] In reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4]

[5-8] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[5] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[6] The record on appeal is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[7] Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if the record is insufficient to address it.[8]

---

[2] *State v. Swartz*, 318 Neb. 553, 17 N.W.3d 174 (2025); *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024).

[3] *Id*.

[4] See, *State v. Perry*, 318 Neb. 613, 17 N.W.3d 504 (2025); *State v. Clausen*, 318 Neb. 375, 15 N.W.3d 858 (2025).

[5] *State v. Torres Aquino*, 318 Neb. 771, 19 N.W.3d 222 (2025); *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025).

[6] *Swartz, supra* note 2.

[7] *Torres Aquino, supra* note 5; *Rezac, supra* note 5.

[8] See *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

## IV. ANALYSIS

### 1. No Error in Overruling
### Motions for Mistrial

Vazquez contends the district court erred in overruling his motions for mistrial, both of which were premised on alleged violations of the order in limine. As stated, that order generally precluded witnesses from testifying about the specific nature of the warrants for Vazquez' arrest, but it permitted referring to warrants for a "serious" or "felony" crime.

[9-11] A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[9] We review rulings on motions for mistrial for an abuse of discretion,[10] and our deferential standard stems in part from the recognition that the trial judge is often better situated than a reviewing court to assess the atmosphere of the trial and the impact of certain evidence or events.[11] And where, as here, a motion for mistrial is premised on adducing evidence that violates an order in limine, an appellate court will consider that the trial judge was in the best position to assess the potential impact of such evidence on the jury.[12]

[12] To prove error predicated on the failure to grant a mistrial, a defendant faces a higher threshold than merely

---

[9] *Lenhart, supra* note 1.

[10] See *id.*

[11] *State v. Trail*, 312 Neb. 843, 889, 981 N.W.2d 269, 302 (2022) (observing that deferential standard of review "stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial").

[12] *State v. Todd*, 296 Neb. 424, 438, 894 N.W.2d 255, 265 (2017) (observing trial judge had "the best position to assess the potential impact on the jury" when defense counsel repeatedly adduced evidence in violation of order in limine).

showing a possibility of prejudice.[13] The defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[14] In the sections that follow, we consider each of Vazquez' motions for mistrial and ultimately find no abuse of discretion in overruling either.

(a) First Motion for Mistrial

As stated, the first motion for mistrial was premised on Brown's answer to a question posed by defense counsel seeking to pinpoint the date of a certain conversation between Brown and Vazquez. Brown replied, "I'm not sure of exact dates. I know it was after the first stabbing occurred earlier in the year, and months before the shooting occurred." At a sidebar, Vazquez moved for mistrial, arguing that when Brown mentioned the "stabbing," she was referring to the March 2020 stabbing death that formed the basis for one of Vazquez' arrest warrants, and that therefore, the testimony violated the order in limine. The court overruled the motion.

On appeal, Vazquez argues this amounted to prejudicial error because the jury was allowed "to speculate about and consider [Vazquez'] possible involvement in a serious violent crime of stabbing another human being."[15] The premise of Vazquez' argument is that the jury necessarily connected Vazquez to the particular stabbing that formed the basis for one of the arrest warrants, but we find that somewhat implausible on this record.

Jurors knew that officers were attempting to arrest Vazquez on a felony warrant when the standoff occurred, but we see nothing in the record suggesting that jurors had any reason to suspect the underlying felony involved a fatal stabbing. Nor do we find it likely that jurors might have assumed the

---

[13] See *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378 (2023), *cert. denied* ___ U.S. ___, 144 S. Ct. 241, 217 L. Ed. 2d. 109.

[14] *Id*.

[15] Brief for appellant at 38.

stabbing was the "prior incident" that Brown referred to in her testimony, because Brown expressly testified that someone other than Vazquez had been charged in that incident. Simply put, we see nothing about Brown's vague reference to a "stabbing" that would suggest to a reasonable juror that Vazquez was involved in the stabbing or was being arrested for the stabbing, and we have been directed to no other trial evidence that might support such an inference. On this record, it appears the trial court overruled the motion for mistrial because it did not think Brown's testimony plainly violated the order in limine at all. We find no abuse of discretion in that ruling.

### (b) Second Motion for Mistrial

During cross-examination, Ross was asked by defense counsel for the "exact words" officers used after they knocked on the bedroom door, and he replied that officers said they had a warrant for Vazquez for a "second-degree assault." Vazquez moved for mistrial, arguing this testimony violated the order in limine prohibiting evidence about the nature of the crimes underlying the arrest warrants. Again, we see no abuse of discretion in the court's decision not to grant a mistrial.

Although Ross' testimony about a warrant for "second-degree assault" was a technical violation of the court's order in limine, we cannot conclude this evidence was of such a nature that it actually prejudiced Vazquez and prevented a fair trial. First, the witnesses' single reference to "second-degree assault" was directly responsive to defense counsel's question, even though the record suggests counsel was anticipating a different response. But more importantly, we see nothing about mentioning a warrant for second degree assault that can be said to have actually prejudiced Vazquez in this case, particularly since jurors already knew, through properly admitted evidence, that at least eight officers were present to arrest Vazquez on a warrant for a "serious felony." The district court did not abuse its discretion in overruling the motion for mistrial based on this testimony.

## 2. No Error in Overruling Objection
### to Testimony of Vazquez' Father

The State called Vazquez' father as a witness in its case in chief. When the prosecutor asked the father what sort of response Vazquez had to the shooting, defense counsel objected on grounds of relevance, and the objection was overruled. The father replied that he did not remember his son's response to the shooting. The State then attempted to refresh the father's recollection by having him review a typed transcript of a recorded phone call between the father and Vazquez. After reviewing the transcript, the father testified that he remembered Vazquez saying he felt bad about the shooting. The State then asked the father whether Vazquez had actually said that he "didn't feel bad." The father again replied that he could not remember.

On appeal, Vazquez argues the trial court abused its discretion in overruling defense counsel's relevancy objection to the line of questions asking about Vazquez' response to the shooting. We disagree.

[13,14] Under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016), "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[16] The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing.[17]

Vazquez contends, without citation to any legal authority, that evidence of his remorse, or lack thereof, did not relate

---

[16] See, *State v. German*, 316 Neb. 841, 7 N.W.3d 206 (2024); *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022). See, also, *State v. Tucker*, 301 Neb. 856, 865, 920 N.W.2d 680, 688 (2018) ("[e]vidence is relevant if it tends in any degree to alter the probability of a material fact").

[17] *German, supra* note 16; *Abligo, supra* note 16.

to any fact of consequence and therefore was irrelevant. The State, on the other hand, contends the objection was properly overruled because Vazquez' lack of remorse was relevant to a fact of consequence—whether Vazquez intended to shoot at the officers or, as he claimed, only intended to shoot at the tree.

We have suggested that a defendant's lack of remorse for a killing is relevant to whether the killing was done "intentionally."[18] Other courts have likewise held that a defendant's comments and actions tending to show a lack of remorse for a killing are relevant and admissible to prove the defendant's mental state, including malice and premeditation.[19]

[15] In this case, Vazquez' mental state at the time he fired the gun was the primary controverted issue at trial. Evidence that he expressed a lack of remorse for Herrera's killing is relevant because it tends to show that he shot purposely and with deliberate and premeditated malice. The district court did not abuse its discretion in overruling the relevancy objection to this evidence.

### 3. Sufficiency of Evidence

Vazquez assigns that the evidence was insufficient to support his convictions for attempted first degree assault on an

---

[18] *State v. Mowell*, 267 Neb. 83, 100, 672 N.W.2d 389, 403 (2003).

[19] See, e.g., *Government of Virgin Islands v. Donovan*, 335 Fed. Appx. 206, 209-10 (3d Cir. 2009) (defendant's statement was "quite probative insofar as it shows a striking lack of remorse indicative of malice aforethought and premeditation"); *Hubers v. Commonwealth*, 617 S.W.3d 750 (Ky. 2020) (evidence that defendant would smile, wink, and laugh about murder showed lack of remorse and was relevant to prove defendant's mental state when crime was committed); *People v. Michaels*, 28 Cal. 4th 486, 528, 49 P.3d 1032, 1057, 122 Cal. Rptr. 2d 285, 315 (2002) (absence of remorse "may be relevant, because it sheds light on the defendant's mental state, in determining the degree of the homicide or the existence of special circumstances"); *People v. Paquette*, 214 Mich. App. 336, 342, 543 N.W.2d 342, 345 (1995) ("[d]efendant's conduct after the killing is relevant to a determination whether there was premeditation and deliberation sufficient for a finding of first-degree murder").

officer and the corresponding conviction for use of a firearm to commit a felony. Both these convictions relate to the injuries suffered by Jennings during the shooting. We understand Vazquez to argue the evidence was insufficient in two respects: (1) He claims there was no evidence that he intentionally shot at Jennings, and (2) he claims there was insufficient evidence that the injuries to Jennings' shins were caused by bullet fragments rather than debris from the ceramic mug thrown through the window by Ross.

As stated, in reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[20]

First degree assault on an officer is defined by Neb. Rev. Stat. § 28-929(1) (Cum. Supp. 2024) as "intentionally or knowingly caus[ing] serious bodily injury" to a "peace officer" while such officer "is engaged in the performance of his or her official duties." A "peace officer" includes a police officer.[21] Attempt is defined by Neb. Rev. Stat. § 28-201 (Cum. Supp. 2024) as either "[i]ntentionally engag[ing] in conduct which would constitute the crime if the attendant circumstances were as [the defendant] believes them to be" or "[i]ntentionally engag[ing] in conduct which, under the circumstances as [the defendant] believes them to be, constitutes a substantial step in a course of conduct intended to culminate in [the defendant's] commission of the crime."

On appeal, Vazquez argues there is "no evidence" that he "fired at Jennings or that he attempted to fire at someone else and that caused injury to Jennings."[22] We disagree. Viewed in

---

[20] *Perry, supra* note 4; *Clausen, supra* note 4.

[21] See Neb. Rev. Stat. § 49-801(15) (Reissue 2021).

[22] Brief for appellant at 45.

the light most favorable to the State, there is significant circumstantial evidence that Vazquez intentionally shot at Jennings.

Audio captured by Herrera's police-issued recording device establishes that Vazquez' first shot hit Herrera, who screamed in pain almost immediately. Thereafter, Vazquez fired two additional shots. Vazquez admitted that he made sure the gun was cocked before he exited the window, and he admitted that he saw an officer holding a shield when he looked out the window; other evidence at trial established that Jennings was standing near a tree holding a shield. A reasonable fact finder could infer from this evidence that Vazquez not only knew where Jennings was standing when he fired the gun, but also that he intentionally fired multiple shots at Jennings.

Vazquez also argues there was insufficient evidence that the injuries to Jennings' shins were caused by debris from the gunshots as opposed to debris from the ceramic mug that was thrown through the window. But Jennings testified that he felt debris hit him as he moved to his right, which, according to Jennings, occurred after the ceramic mug had already been thrown through the window. Thus, there was evidence from which a reasonable juror could conclude that debris from the gunshots, and not from the ceramic mug, caused Jennings' injuries. There was also evidence from a firearms expert that the metal jacket of a fired bullet can tear apart and peel off and result in debris.

And, finally, because the evidence was sufficient to support the conviction for attempted assault on an officer, it was sufficient to support the conviction for use of a firearm to commit that offense. This assignment of error is without merit.

### 4. CUMULATIVE TRIAL ERROR

[16,17] Vazquez assigns and argues that cumulative error at trial deprived him of his right to a fair trial by an impartial jury and warrants a new trial. We have generally recognized the doctrine of cumulative error in the context of a criminal

jury trial, and whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.[23] Although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his or her constitutional right to a public trial by an impartial jury.[24]

Vazquez argues he is entitled to a new trial based on cumulative error for the following reasons:

> This case involved many consolidated claims that included multiple errors. There were enough claims with merit to resonate. This was an 11[-]day trial that did not need to be that long. The trial suffered from efforts to pursue themes that were presented for effect and not for presenting evidence that might serve to prove or disprove an element of the offenses. There was deficient performance by trial counsel and misconduct on the part of the State. The big picture here is more than an accumulation of the parts. One can remove a pixel here or there and still have enough to discern an image of a trial that broke down and did not deliver fairness and the process that was due.[25]

Based on this argument, we understand Vazquez to contend that his claim of cumulative error encompasses not only alleged error by the trial court, but also alleged deficient performance by trial counsel. Although we acknowledge that some of our prior opinions have referenced both when discussing claims of cumulative error,[26] we have not expressly held that meritorious claims of ineffective assistance are properly

---

[23] See, *Dap, supra* note 8; *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022); *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

[24] *Anders, supra* note 23.

[25] Brief for appellant at 77.

[26] See, *Anders, supra* note 23; *Stelly, supra* note 23.

included in an analysis under the cumulative error doctrine. This is an open question in other jurisdictions too.[27]

But this case does not require us to affirmatively decide whether meritorious claims of ineffective assistance of trial counsel can be part of the cumulative error analysis, because even assuming without deciding that they can, there is no cumulative error on this record. As we have already explained, none of Vazquez' claims of error by the trial court have merit. And as we will explain next, Vazquez' claims of ineffective assistance of counsel fare no better. Because his ineffective assistance claims are either without merit or not sufficiently raised or the record is insufficient to resolve them on direct appeal, this record does not support a claim of cumulative error.[28]

### 5. Claims of Ineffective Assistance of Counsel

In this direct appeal, Vazquez asserts 17 claims of ineffective assistance of trial counsel, which we generally group into eight categories. As recategorized, Vazquez contends his trial counsel was deficient in (1) failing to object to evidence designed to appeal to jurors' emotions, (2) failing to redact or seek suppression of portions of the recorded interview, (3) failing to object to improper character evidence, (4) asking and failing to object to improper questions about veracity, (5) failing to impeach certain witnesses, (6) failing to conduct effective voir dire, (7) failing in miscellaneous other ways, and (8) failing to present effective evidence and argument at sentencing.

---

[27] See, e.g., *Middleton v. Roper*, 455 F.3d 838 (8th Cir. 2006) (holding cumulative effect of alleged errors by trial counsel not grounds for granting habeas relief under cumulative error analysis); *U.S. v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) (holding cumulative error analysis evaluates only effect of matters actually determined to be error and "cumulative effect of non-errors" is irrelevant). But see *U.S. v. Baptiste*, 8 F.4th 30 (1st Cir. 2021) (finding ineffective assistance of counsel based on cumulative error doctrine).

[28] See, *Anders, supra* note 23; *Stelly, supra* note 23.

On direct appeal, familiar principles guide our analysis of claims that trial counsel was ineffective. Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.[29] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[30]

[18-20] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[31] To raise an ineffective assistance of counsel claim on direct appeal, the defendant must allege deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.[32] When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.[33]

Once raised, an appellate court will determine whether the record on appeal is sufficient court to review the merits of the

---

[29] *Torres Aquino, supra* note 5; *Rezac, supra* note 5.

[30] *Swartz, supra* note 2.

[31] *Id*.

[32] See *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

[33] *Id.*

ineffective performance claims.[34] The record on direct appeal is sufficient to conclusively determine a claim of ineffective assistance of counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[35] Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record.[36]

[21-25] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[37] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[38] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[39] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[40] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[41] A court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either.[42]

---

[34] *Id.*

[35] *Id.* See, also, *Torres Aquino, supra* note 5; *Rezac, supra* note 5.

[36] See *Dap, supra* note 8.

[37] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[38] *Swartz, supra* note 2.

[39] *Id*.

[40] *Id*.

[41] *State v. Goynes*, 318 Neb. 413, 16 N.W.3d 373 (2025).

[42] *State v. Esch*, 315 Neb. 482, 997 N.W.2d 569 (2023).

[26-28] When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics.[43] There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.[44] And finally, in determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.[45]

### (a) Failure to Object to Unduly Emotional and Inflammatory Evidence

Vazquez asserts that his trial counsel was ineffective in failing to object to several pieces of evidence he characterizes as "inflammatory."[46] This evidence includes (1) an audio recording of Herrera at the scene of the shooting, (2) remarks about Herrera made by the prosecution during opening statement, (3) testimony about how Herrera's wife and daughter were notified of the shooting, (4) photographs of Herrera's belongings, and (5) testimony from Herrera's wife. Vazquez argues, somewhat interchangeably, that all such evidence was irrelevant under rule 401 and was unduly prejudicial under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). We discuss his arguments regarding this evidence in the sections that follow, but first we review the relevant legal principles.

[29,30] As already noted, rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

---

[43] *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[44] *Id*.

[45] See, *Stelly, supra* note 23; *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014); *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

[46] Brief for appellant at 48.

be without the evidence." Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Generally, prosecutors have a duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.[47] They may not inflame the jurors' prejudices or excite their passions against the accused.[48] This rule includes intentionally eliciting testimony from witnesses for prejudicial effect.[49]

### (i) Herrera Audio

A 41-minute-long audio recording captured by Herrera's police-issued recording device was offered by the State at trial and was published to the jury. Vazquez' trial counsel did not object to any portion of this recording. The audio started during Herrera's initial interaction with Vazquez' stepmother and concluded as Herrera was removed from the scene by medics. A transcription of the audio was given to the jury as an aid when it was published.

As relevant here, the audio recorded the sound of the ceramic mug breaking the window and Herrera asking, "[W]hat was that?" About 2 seconds later, more breaking glass is heard as Ross and Vazquez exit the window, and then a voice that appears to be Herrera's shouts, "Hey, get on the ground!" Immediately thereafter, at least one "pop" is heard and Herrera begins screaming in pain. As he screams, more pops are heard in the background. Herrera continues screaming and yells, "I can't breathe." He then says, "Call my wife." Another voice is heard in the background saying, "[O]fficer down." After

---

[47] See, *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016*)*; *Iromuanya, supra* note 45.

[48] *Id*.

[49] *Iromuanya, supra* note 45.

the popping ends, the audio recording continues for several more minutes as Herrera is attended to by other officers and paramedics. During this time, Herrera can be heard moaning in pain, repeating that he cannot breathe, and expressing love for his wife and children.

On appeal, Vazquez concedes the audio recording was relevant and provided "the best evidence of the sequence of events from the moment the window was broken through the firing of Jennings' four shots."[50] But he argues that once the gunshots stopped, trial counsel should have objected to the admissibility of the final few minutes of the audio on grounds of relevance and unfair prejudice. He argues that counsel's failure to do so amounted to deficient performance and inflamed the passions of the jury with "evidence of [Herrera's] desperation and the need to have someone let his wife and children know he loved them—a message that was heard through [Herrera's] own voice amongst the nearly unbearable screams, moans and unquenchable sadness."[51]

Having carefully reviewed the audio, we agree it is emotionally intense, both before and after the gunshots stop. But we are not persuaded by Vazquez' assertion that if trial counsel had objected to the last several minutes of the audio recording, the trial court would have sustained the objection. Events occur quickly on the audio—glass breaks, Herrera yells to get down, and then the first "pop" is heard and Herrera's screams begin almost simultaneously. Herrera's first plea for someone to contact his wife occurs almost immediately after the first pop, while other pops are happening in the background. As such, in the portion of the audio recording that Vazquez rightly concedes was both relevant and admissible, the jury already heard Herrera's screams of pain and his urgent pleas to tell his wife and children that he loved them. The final few minutes of the audio contain similar sounds

---

[50] Brief for appellant at 52.

[51] *Id*. at 52-53.

and in that respect was cumulative, but it also documented the crime scene live, as events unfolded, and was relevant for that purpose as well.

[31] We have observed that gruesome crimes produce gruesome photographs, and we have consistently held that photographs illustrating a controverted issue in a homicide case are admissible even if gruesome, so long as the probative value is not outweighed by the prejudicial effect.[52] Much like graphic photographic evidence of a crime, the audio recording of the crime in this case was intense, but it was relevant and accurately depicted the stark reality of an officer who had been shot by a fleeing suspect. We cannot find that the probative value of the audio recording was outweighed either by the danger of unfair prejudice or by considerations of needlessly cumulative evidence.

But even if trial counsel could be found deficient in failing to object to the last few minutes of the audio, the record affirmatively shows that Vazquez cannot show actual prejudice under *Strickland*.[53] The trial court's written instructions informed the jurors they must not decide the case based on sympathy or prejudice, and the few minutes of audio after the gunshots ended was a short moment in a long trial where the critical issue was Vazquez' mental state when he fired at the officers.[54] There was considerable evidence adduced that Vazquez intended to shoot the officers, and the evidence in that regard was strong. Summarized, the evidence showed that Vazquez knew the officers were outside the window during the standoff, that he asked Ross if he could "shoot out," that he cocked the loaded gun before exiting the window, that he aimed the gun out the window knowing that officers were outside, that he continued to fire the gun after hearing

---

[52] See *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

[53] See *Strickland, supra* note 37.

[54] Cf., *Stelly, supra* note 23; *Dubray, supra* note 45; *Iromuanya, supra* note 45.

Herrera's screams of pain, and that after he was caught and arrested, he lied about having and shooting the gun. In addition, Vazquez admitted to telling his cellmate that he intentionally shot at least one officer, and Brown testified that before the standoff, Vazquez said he would fire at officers if they attempted to arrest him.

In other cases, where evidence relating to the controverted issue was particularly strong, we held the record affirmatively demonstrated that the defendant could not establish prejudice under *Strickland* because there was no reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding.[55] We reach the same conclusion here.

On this record, even if trial counsel had successfully objected to the last few minutes of the audio recording and the jury had not heard that evidence, there is no reasonable probability that the outcome of the proceeding would have been different. This claim of ineffective assistance has no merit.

### (ii) Opening Statement

During opening statements, the prosecutor informed the jury: "[Y]ou will hear testimony that Officer Luis Mario Herrera answered his last call. You will hear testimony that he goes by Mario, Badge No. 1205." Vazquez argues this was "an improper appeal to sympathy highlighting the special status of a police officer victim and asserting a societal loss because he is no longer able to protect and serve."[56]

[32,33] As a general rule, prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities or personal attributes of the victim, unless such facts are relevant to the criminal prosecution.[57] But a party is allowed considerable latitude in making an opening

---

[55] *Id*. See *Strickland, supra* note 37.

[56] Brief for appellant at 50-51.

[57] See *Iromuanya, supra* note 45.

statement,[58] and it is generally permissible for the State to discuss what the evidence may show.[59] Given the nature of this case, it would be impossible to discuss the charged crimes without reference to the fact that the victims were police officers. The statement "you will hear testimony that Officer Luis Mario Herrera answered his last call" is primarily one of fact, and because it provided an accurate preview of the anticipated trial evidence in a case involving the shooting death of an officer, we cannot find that trial counsel performed deficiently in failing to object to it.

### (iii) First Witness' Testimony

The State's first trial witness was Sgt. Dustin Romshek, who testified that after the shooting he drove to the workplace of Herrera's wife, Carrie, to inform her that Herrera had been shot. Carrie worked at a high school, and Romshek testified that he asked a priest at the school to help him tell Carrie about the shooting. One of Herrera's daughters was a student at the high school, and officers drove Carrie and her daughter to the hospital.

While at the hospital, Romshek collected and photographed Herrera's clothing and belongings as part of the investigation. The items photographed included a neck gaiter, a gun holster and magazine, a flashlight, socks, shoes, a bloody shirt, and a St. Michael medallion. During Romshek's testimony, the State offered photographs of Herrera's shoes, shirt, and medallion. These photographs were admitted into evidence without objection.

On appeal, Vazquez argues that trial counsel was deficient in failing to object to Romshek's testimony about how Herrera's wife and daughter learned about the shooting and

---

[58] *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006); *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990).

[59] *State v. McMillion*, 23 Neb. App. 687, 875 N.W.2d 877 (2016). See *U.S. v. Kalagian*, 957 F.2d 527 (8th Cir. 1992).

in failing to object to certain photographs depicting Herrera's clothing and belongings. We address each argument in turn.

Vazquez relies on *State v. Iromuanya*[60] to argue that trial counsel was deficient for failing to object when Romshek testified about how Herrera's wife and daughter learned about the shooting. He argues that evidence of how a family learns of an injury or death is improper and inadmissible and that here, it served only to inflame the emotions of the jury.

In *Iromuanya*, the defendant fired one gunshot that injured two college students, who were friends. One of the students later died from her injuries. While the surviving student was testifying, he was asked to describe how he learned about the death of his friend; the testimony was so intense it caused two jurors to start crying. On appeal, we stated the prosecutor had no proper purpose for asking the student how he learned of his friend's death and should have known the questions would elicit highly emotional testimony. Ultimately, however, we concluded the defendant could not show prejudice because, even if his trial counsel had timely objected to the improper testimony, there was no reasonable probability that the jury would have acquitted the defendant. That was so, we reasoned, because the improper testimony was just a small part of the State's evidence, the jury was instructed not to decide the case on sympathy or prejudice, and there was strong evidence of the defendant's intent to shoot that tempered any prejudicial impact of the improper testimony.

Unlike in *Iromuanya,* there is nothing in the record here suggesting that jurors had an intense emotional reaction to Romshek's testimony. But even if we assume that counsel was deficient in not objecting to testimony about how Herrera's family learned he had been shot, Vazquez cannot show actual prejudice as a result. In other words, even if trial counsel had successfully objected to the testimony about how Herrera's wife and daughter learned about the shooting, there is no

---

[60] *Iromuanya, supra* note 45.

reasonable probability the outcome of the proceeding would have been different.

Vazquez also contends trial counsel was ineffective for failing to object to some of the photographs of Herrera's clothing and belongings introduced during Romshek's testimony, arguing the photographs were irrelevant and prejudicial. Vazquez particularly contends that the St. Michael medallion was an improper attempt to use a religious symbol to incite jurors' emotions. To the extent the photographs were offered to document items of evidence collected from Herrera as part of the criminal investigation, we cannot agree with Vazquez that the photographs had no relevance at all. This evidence depicted the items that Herrera was wearing when he was shot, and the "bloody" shirt depicted where the bullet entered and exited. And to the extent Vazquez argues that evidence of the St. Michael medallion was designed to appeal to religious sympathies, we note that neither Romshek nor any other witness testified about the religious symbolism of the medallion.

But even assuming without deciding that trial counsel was deficient in failing to object to the photographs of Herrera's belongings introduced during Romshek's testimony, we conclude there is no reasonable probability the result of the proceeding would have been different had the photographs been excluded. Again, the jury was instructed to not decide the case based on sympathy or prejudice, and as noted, there was strong evidence on the critical issue of Vazquez' intent to shoot at the officers. On this record, there is no reasonable probability that Vazquez would have been acquitted or that the result of the proceeding would have been different if trial counsel had successfully objected to the photographs of Herrera's belongings.

### (iv) Testimony of Herrera's Wife

The State called Herrera's wife, Carrie, as a witness at trial. She was shown a portrait of a man in a police uniform, whom she identified as Herrera. She testified she had known

Herrera for 28 years and the next day would have been their 26th wedding anniversary. She also testified they had a son and three daughters. She then testified briefly about the morning of the shooting and her last interaction with Herrera:

> It was a Wednesday morning and it was Mario's Monday and he always got up to go to work before we all got up. And it was about 7:30 in the morning, everybody was gone to school, and I was still blow drying my hair and our house kind of has a long ways—a long hallway, so when you open the door, the front door, I can see down the hallway.
>
> And he opened it and I said, "What are you doing home?" [A]nd he said, "Oh, I forgot this,"—this little backpack that he used to carry, and he gave me a kiss, said he loved me and then he left.

Carrie also identified the photographs of some of Herrera's belongings, including his shoes and the St. Michael medallion that she testified Herrera "never took . . . off."

Vazquez argues that all of Carrie's testimony was designed to appeal to juror's emotions and was either irrelevant or unduly prejudicial; he contends that trial counsel was deficient for failing to object to the testimony on those grounds.

When reviewing claims of alleged ineffective assistance of counsel, an appellate court affords trial counsel due deference to formulate trial strategy and tactics.[61] There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.[62] On this record, considering Carrie's status as Herrera's widow, defense counsel may have had sound strategic reasons for not objecting to her trial testimony.

Ultimately, however, we need not decide whether the lack of objection to Carrie's testimony was the result of trial counsel's strategy or even whether an objection to Carrie's

---

[61] *Garcia, supra* note 43.

[62] *Id.*

testimony would have been sustained. Because even though Carrie's testimony about her husband's death in the line of duty was understandably emotional, Vazquez cannot show actual prejudice from this testimony under *Strickland*.[63]

In light of the jury instruction on sympathy and prejudice already mentioned, the general nature of the case, and the strong evidence relating to the critical issue of Vazquez' intent to shoot at the officers, we cannot find a reasonable probability that the outcome of the trial would have been different if jurors had not heard Carrie's testimony.

### (b) Failure to Seek Redaction or Suppression of Recorded Interview

After his arrest, Vazquez was interviewed at the police station by Hipps. A video recording of the interview was admitted into evidence, and while the recording was being published, jurors were provided a typed transcript as an aid. Because the transcript was not admitted as evidence, we quote directly from the video recording itself when discussing the recorded interview.

Vazquez argues that his trial counsel was ineffective in various ways for allowing portions of the recorded interview into evidence. We address each of his arguments in turn, providing additional background as necessary.

### (i) No Motion to Redact First 22 Minutes of Interview

The recorded interview starts with officers bringing Vazquez into an interview room in handcuffs. His right hand is bandaged. He sits alone in the room for almost 22 minutes before the interview begins, except for a brief period when an officer brings him a bottle of water and helps him to drink it because he is handcuffed. During that brief period, Vazquez is respectful and thanks the officer. After the officer leaves the room,

---

[63] See *Strickland, supra* note 37.

Vazquez burps and says, "Excuse me." For the remainder of the 22 minutes, Vazquez mostly sits quietly with his eyes closed and appears to be sleeping. At times, he sings or raps softly. At one point, he walks over to a wastebasket in the corner of the room and spits.

On appeal, Vazquez argues that trial counsel was ineffective for not objecting to or moving to redact the entire 22-minute portion of the recording. He contends that this entire portion was irrelevant and that any arguable relevance was outweighed by the danger of unfair prejudice. He asserts that counsel's failure to redact this portion of the video allowed the State to reference the video during closing argument and suggest to the jury that it showed a lack of remorse, arguing, "He's singing, he's burping, he's spitting, he's sleep — he's yawning, all after he just shot a police officer."

The State argues that the entire 22 minutes at the beginning of the interview was relevant and admissible because it was part of the police investigation, it demonstrated Vazquez' state of mind immediately after the shooting, and it showed a lack of remorse that provided circumstantial evidence of premeditation and intent. The State also contends that the relevance of this portion of the video was not outweighed by unfair prejudice and that therefore, trial counsel was not deficient in failing to object to or seek redaction of the first 22 minutes of the recording.

[34] We agree with the State that this portion of the recording was relevant evidence, and we are not persuaded that an objection on relevance would have been sustained to the entirety of the first 22 minutes of the video. As a matter of law, trial counsel cannot be ineffective for failing to make a meritless motion, objection, or argument.[64]

Nor are we persuaded, on this record, that the trial court would have sustained an objection on the basis that any

---

[64] See, *Rezac, supra* note 5; *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023), *cert denied* ___ U.S. ___, 144 S. Ct. 1073, 218 L. Ed. 2d 249 (2024); *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018).

relevance was outweighed by the danger of unfair prejudice. Indeed, during closing argument, defense counsel expressly referenced and relied on the first 22 minutes of the video, stating: "Now, you've seen many witnesses testify about [Vazquez'] politeness, his respectfulness. You've seen it on display in his statement when he was arrested. He burped in an empty room, nobody around to hear him, and he said, 'Excuse me.' . . . [T]hey want to try to show him as being disrespectful, but you've seen evidence to the contrary." Defense counsel's reliance on this portion of the recording suggests it was a strategic or tactical decision not to seek redaction of the first 22 minutes of the recording. And reasonable strategic decisions by trial counsel will not be second-guessed on appeal.[65]

For all these reasons, we conclude the record affirmatively shows that trial counsel did not perform deficiently in failing to object to or seek redaction of the first 22 minutes of the recorded interview.

### (ii) No Motion to Suppress
### Pre-Miranda Statements

After Hipps entered the interview room and introduced himself to Vazquez, the two engaged in small talk and then the following colloquy occurred:

> HIPPS: I'm hoping you and I can have a conversation. Some pretty crazy things happened tonight and hopefully you can tell me your side of the story. Figure out what's going on. Right now, I only know a very little bit of what I'm being told by other people happened. I wasn't there. . . . I'm hoping maybe you can help me out, help me understand what was going on. And, uh
>
> VAZQUEZ: I was only person that got caught.
>
> HIPPS: Help me out with that. Okay. Well you, uh, you want to tell me your side of the story?
>
> VAZQUEZ: I mean I just woke up to people knocking on the door.

---

[65] *Garcia, supra* note 43.

HIPPS: Okay.

VAZQUEZ: And I was I wasn't trying to go. So, I just did what I did. Went out through the window and I ran.

HIPPS: Okay. Well you made it a ways.

VAZQUEZ: In a major way?

HIPPS: I said, you made it a ways.

VAZQUEZ: Oh, yeah. I tried to.

Immediately after this exchange, Hipps advised Vazquez of his *Miranda* rights, and Vazquez waived those rights and agreed to speak with Hipps.

Vazquez argues that trial counsel was ineffective for failing to seek suppression of these pre-*Miranda* statements. He contends that because of counsel's failure, the prosecutor was able to refer in closing argument to Vazquez' statements that he "wasn't trying to go" and he just "did what [he] did," and that the State relied on these statements to show "evidence of a guilty mind."[66]

[35] *Miranda v. Arizona*[67] prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.[68] Because Vazquez was plainly in custody when these statements were made, we focus first on whether Hipps' words or actions constituted interrogation.

[36] Generally, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.[69] Here, when Hipps said, "Help me out with that . . . . [Y]ou want to tell me your side of the story?" he

---

[66] Brief for appellant at 56.

[67] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[68] *Vaughn, supra* note 13.

[69] *Id*.

arguably engaged in questioning that was likely to elicit an incriminating response. But even assuming, for the sake of argument, that Hipps' statement could be characterized as interrogation rather than an introductory statement, and further assuming that Vazquez' somewhat vague response that he "did what [he] did" was incriminating, we think the record affirmatively shows that Vazquez cannot establish prejudice from the failure to seek suppression of that response. In other words, even if counsel had suppressed Vazquez' response and the jury did not hear him say, "I just did what I did. Went out through the window and I ran," there is not a reasonable probability that the result of the proceeding would have been any different.

We have already discussed the strength of other properly admitted evidence tending to establish Vazquez' premeditation and intent to shoot at the officers, and we need not repeat it. Given that evidence, Vazquez cannot establish actual prejudice based on his trial counsel's failure to suppress his pre-*Miranda* statements. This claim of ineffective assistance is without merit.

### (iii) No Motion to Suppress
### Post-Miranda *Statements*

Vazquez also argues that trial counsel was deficient for failing to seek suppression of several statements he made to Hipps after waiving his *Miranda* rights. Before addressing these arguments, we provide additional background regarding the interview with Hipps.

Shortly after waiving his *Miranda* rights, Vazquez was asked, "So what actually happened today?" He told Hipps that after he jumped out of the window, he "heard the gunshots and started running." Vazquez repeatedly denied having a gun with him at any point during the events that day.

Hipps eventually told Vazquez that law enforcement had recovered the gun. When Hipps asked Vazquez where he got the gun he used to shoot at the officers, Vazquez replied: "If

y'all got the gun, then go do what you gotta do bro . . . I'm just gonna go to jail right now, gonna make my one phone call, eat, take a shower, and go to bed." Immediately after this reply, the following exchange occurred:

HIPPS: Okay. Uhm, you were involved in something pretty scary today. And something pretty crazy. And this is your only chance that you're gonna have to just sit here and tell your side of the story. And, uh, I really need honesty. I want honesty from you right now.

VAZQUEZ: I'm, uh, I'm tired. I told you what it was bro.

HIPPS: Okay. But what you're telling me, does not match up with the facts.

VAZQUEZ: I'm gonna do no more.

HIPPS: Okay?

VAZQUEZ: Man, this is what happened bro.

HIPPS: Did you shoot through that window?

VAZQUEZ: Man, you, uh, I (chuckles) I ain't (inaudible) to shoot out of no window, bro. I jumped through that motherfucker. Even if I had a gun, I wouldn't shoot.

HIPPS: You did. You did have a gun. So, let's . . . not not be (inaudible) around, you did have one, right?

VAZQUEZ: Nah, I ain't saying nothing.

HIPPS: Yeah, you did. We have it.

VAZQUEZ: I mean if y'all got it, what are we trying to do bro? Then get y'all fingerprints. That's how y'all do it with y'all cases bro.

HIPPS: Well that's not happening right now.

VAZQUEZ: That's good.

HIPPS: And when your fingerprints come around and tell a different story than what you're telling, then that . . . doesn't make you look like someone who made a mistake and now wants to do whatever they can to make it right. It makes you look like someone who made a mistake and is doing everything they can to get away with it. Okay. And that's not gonna happen.

VAZQUEZ: I understand that. I ain't changing my story though. So . . . I mean, if you know the truth bro, why are you asking me?

The interview continued, and Vazquez continued to deny having or shooting a gun during the standoff. Then, the following exchange occurred:

VAZQUEZ: I don't know. I don't touch guns bro. I shot my first gun when I was like 4 years old but I never shot a gun since.

HIPPS: Yeah, except for today.

VAZQUEZ: Yeah. I don't know man. (Inaudible) questions, bro cause I just (inaudible) I need my lawyer so I can go to jail bro. I'm trying to get this shit washed up (gestures to his bandaged hand). Well that nasty ass cut right there.

HIPPS: I see that.

VAZQUEZ: I mean y'all must have caught the other dude too, right or no? Must have. . . . Can I go? (Laughs) This is crazy. You just staring at me, I'm not trying to be here, it's like come on, just get it over with, put me in the cruiser and to to JDC . . . to County if you want to, I don't even care, bro just take me somewhere.

HIPPS: Well before you go, um, do you have a cell phone?

VAZQUEZ: No sir.

HIPPS: You don't own one or you don't have one with you?

VAZQUEZ: Y'all took my last one . . . .

At trial, Hipps testified that immediately after this exchange, he stopped the interview because he understood Vazquez to be requesting a lawyer and to be transported to either juvenile detention or county jail. On appeal, Vazquez does not dispute that Hipps ended the interview after this exchange, but he contends it should have ended sooner.

More specifically, Vazquez contends that he invoked his right to remain silent three times before Hipps ended the

interrogation, and he argues that his trial counsel was deficient for not moving to suppress all statements made after these claimed invocations. He also argues that trial counsel was deficient for failing to seek suppression of a statement by Hipps that Vazquez characterizes as expressing an improper opinion on Vazquez' honesty. As we will explain, the record on appeal affirmatively refutes these claims of ineffective assistance.

### a. Invocations of Right to Remain Silent

[37-41] We first address Vazquez' contention that his counsel should have moved to suppress all post-*Miranda* statements he made after he invoked his right to remain silent. If a suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.[70] To require cessation of custodial interrogation, the invocation of the right to counsel must be unambiguous and unequivocal.[71] The desire to cut off questioning must be made with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.[72] Ambiguous or equivocal statements that might be construed as invoking the right to silence do not require the police to discontinue their questioning.[73] It is a mixed question of law and fact whether there has been an unambiguous invocation of the right to remain silent or to have counsel.[74] In determining whether there has been a clear invocation, an appellate court reviews the totality of the circumstances surrounding the statement in order to assess the

---

[70] *Mabior, supra* note 64.

[71] See *id*.

[72] *German, supra* note 16; *State v. Schroeder*, 279 Neb. 199, 777 N.W.2d 793 (2010).

[73] *Id*.

[74] See *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

words in context.[75] Relevant facts include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation.[76]

As noted, Vazquez contends that he unambiguously invoked his right to remain silent at least three times during the interview prior to the point at which Hipps stopped the interrogation. The first time was when he said, "If y'all got the gun, then go do what you gotta do bro . . . . I'm just gonna go to jail right now, gonna make my one phone call, eat, take a shower, and go to bed." The second time was in response to Hipps' telling him that his story "does not match up with the facts," to which Vazquez replied, "I'm gonna do no more." And the third time was in response to Hipps asking, "[Y]ou did have [a gun], right?" to which Vazquez replied, "Nah, I ain't saying nothing."

When these three statements are viewed in the context of the full interrogation, we cannot find that a reasonable police officer under the circumstances would have understood any of the statements to be a clear and unambiguous invocation of the right to remain silent. To the contrary, considering all the circumstances surrounding these statements, we think a reasonable officer would have understood Vazquez' first statement as nothing more than hyperbole, his second statement as an indication that he was not inclined to change his story, and his third statement as merely refusing to answer a specific question about whether he had a gun. After each of these three statements, Vazquez continued to willingly participate in the interview by both asking and responding to questions. In

---

[75] See, *German, supra* note 16; *Schroeder, supra* note 72.

[76] *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017).

sum, the record affirmatively refutes Vazquez' claim that his counsel was deficient in failing to seek suppression based on any of the three statements, because none of the statements clearly invoked the right to remain silent.

### b. Statements About Truthfulness

Next, Vazquez argues that his trial counsel was ineffective for failing to object to or move to suppress certain statements about honesty made by Hipps during the interview. We first quote the statements being challenged on appeal and then discuss the relevant legal principles.

After Vazquez denied having or shooting a gun during the standoff, Hipps stated:

> I wanna get your side of the story. But when its so clear that your side of the story isn't true, what you're telling me isn't true, and it goes contrary to a bunch of other people that saw what happened and the evidence that we have, that makes you look like, it makes you look bad. It makes you look dishonest. And not just like someone who made a mistake. . . . But someone who's sinister, evil, and dishonest. And I don't think you're that kind of person. I don't know you, I don't. And I'm not gonna pretend I do. But just sitting here talking to you, you don't seem like that kind of person to me. Okay?

On appeal, Vazquez argues that trial counsel was deficient for not objecting to or moving to redact these statements by Hipps. His argument relies exclusively on our opinion in *State v. Rocha*.[77]

In *Rocha*, illegal drugs were found in the defendant's car after he was arrested. During his postarrest interview, the defendant said the drugs belonged to his cousin, who had given them to him to hold as collateral for a $700 loan. During the course of the interview, the interrogating officer repeatedly made statements questioning the defendant's veracity, and the defendant insisted he was being honest. The defendant

[77] *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

objected to the admissibility of the investigator's statements on the basis that it was impermissible opinion testimony on whether the drugs belonged to the defendant and whether the defendant was being honest. The court overruled the objection, but gave a limiting instruction advising jurors that the officer's statements were "'interview techniques and should not be considered as substantive evidence in any way in determining if [the defendant was in] possession of the alleged controlled substance, nor . . . when considering the truthfulness of any statements made by [the defendant].'"[78] No similar instruction was requested or given in the instant case.

[42,43] In *Rocha*, we found no reversible error in admitting the officer's statements. When discussing the admissibility of statements made by interrogating officers during a recorded interview played for the jury, *Rocha* rejected a rule that "would render categorically inadmissible all statements by law enforcement in a recorded interview that happened to implicate a defendant's credibility," reasoning that such a rule would risk "excluding important and necessary context to the defendant's admissible responses."[79] But we also rejected a rule that would categorically allow all such statements, reasoning that "would run the risk of allowing the admission of irrelevant and potentially unfair prejudicial statements."[80] Instead, we adopted the following rule:

> [S]tatements by law enforcement officials on the veracity of the defendant or other witnesses, made within a recorded interview played for the jury at trial, are to be analyzed under the ordinary rules of evidence. Such commentary is not admissible to prove the truth of the matter asserted in the commentary. But it may be independently admissible for the purpose of providing necessary context to a defendant's statements in the interview which

---

[78] *Id*. at 725, 890 N.W.2d at 190.

[79] *Id.* at 740, 890 N.W.2d at 199.

[80] *Id.*

are themselves admissible. The police commentary must be probative and material in light of that permissible purpose of providing context to the defendant's responses. And even statements that are otherwise admissible may be excluded under rule 403. Upon request, a defendant is entitled to a limiting instruction that such statements are to be considered only for the permissible purpose of providing context to the defendant's statements in the interview.[81]

*Rocha* cautioned that by adopting this rule, we did not open a "'back door' to allow the admission of improper opinion testimony simply by labeling it as 'context,'"[82] and we emphasized that "[t]rial courts have a serious responsibility to ensure that statements are relevant for the permissible purpose of providing necessary context to a defendant's statements or that such statements do not run afoul of rule 403."[83] *Rocha* also observed that nothing about its holding "should be read to effect the operation of the rule of completeness, under which a party is entitled to admit the entirety of an act, declaration, conversation, or writing when the other party admits a part and when the entirety is 'necessary to make it fully understood.'"[84]

Applying the *Rocha* framework here, we note that the nature of Hipps' statements are somewhat different than those considered in *Rocha*. In *Rocha*, the interrogating officer's statements directly and repeatedly accused the defendant of lying during the interview about whether the drugs were his and whether he knew the drugs were in his vehicle—both those issues were contested matters for the jury to determine. In the instant case, Hipps' statements were framed more as an appeal to give honest answers so that Vazquez would not "look dishonest" later. And because Vazquez admitted at trial that

[81] *Id.* at 740-41, 890 N.W.2d at 199.

[82] *Id.* at 741, 890 N.W.2d at 199.

[83] *Id.* at 741, 890 N.W.2d at 199-200.

[84] *Id.* at 742, 890 N.W.2d at 200.

he was lying during the interview when he denied having or shooting a gun, his veracity in that regard was not a contested issue for the jury to determine. But perhaps more importantly, we cannot overlook the fact that Hipps also stated, two times, that he did not think Vazquez seemed like the "kind of person" who was evil or dishonest. In light of these more positive statements about Vazquez' truthfulness, it is at least plausible that defense counsel made a tactical decision not to object under *Rocha*, believing that Hipps' statements were, on balance, something counsel wanted the jury to hear.

But even if counsel's actions could not be justified as part of a plausible trial strategy, we nevertheless conclude, on this record, that Vazquez cannot establish actual prejudice under *Strickland*.[85] That is so because even if all of Hipps' statements about Vazquez' honesty had been redacted from the recorded interview, for all of the reasons we have previously articulated related to the strength of the evidence against Vazquez, there is not a reasonable probability that the result of the proceeding would have been any different.

### (c) Failure to Object to Character and Propensity Evidence

[44,45] Next, Vazquez argues that trial counsel was ineffective in failing to object to improper character or propensity evidence offered by the State at trial. In a criminal case, Neb. Evid. R. 404(1), Neb. Rev. Stat. § 27-404(1) (Cum. Supp. 2024), operates as a broad exclusionary rule of relevant evidence that speaks to a criminal defendant's propensity to have committed the crime or crimes charged.[86] Rule 404(2), however, has been described by this court as a rule of inclusion because it permits evidence of other crimes, wrongs, or acts to be admissible for all purposes except to prove the character of a person in order to show that such person acted

---

[85] See *Strickland, supra* note 37.

[86] *Esch, supra* note 42.

in conformity with that character.[87] Evidence that is offered for a proper purpose under rule 404(2) is often referred to as having "special" or "independent" relevance, which means its relevance does not depend upon its tendency to show propensity.[88]

[46] Relatedly, under rule 404(2), proof of another distinct substantive act is admissible in a criminal prosecution when there is some legal connection between the two upon which it can be said that one tends to establish the other or some essential fact in issue.[89] In other words, evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question.[90]

The specific evidence Vazquez challenges includes (1) a question asked of his stepbrother about his knowledge of Vazquez' feelings toward police, (2) a statement Vazquez made to police while detained at a juvenile detention center after his arrest, (3) a "goodbye" letter Vazquez left at the detention center when he was moved to jail after turning 18 years old, (4) a statement made by Ross during his testimony, and (5) a statement made by Vazquez' father that was captured on body camera footage. We address the first three together, and the remaining two separately. But first, we provide additional background facts.

### (i) Stepbrother, Youth Center, and "Goodbye" Letter

Vazquez' stepbrother testified for the defense. On direct examination, he testified about events that occurred prior to the standoff and about his communication with Vazquez

---

[87] *State v. Moore*, 317 Neb. 493, 10 N.W.3d 531 (2024).

[88] *Id.*

[89] *Id.*

[90] *Id.*

after his arrest. On cross-examination, the stepbrother was asked whether Vazquez had ever told the stepbrother "how he felt about police." Defense counsel's objections on foundation and relevance were overruled, and the stepbrother answered, "No."

For the first few months after his arrest, Vazquez was detained in a juvenile detention center because he had not yet reached 18 years of age. During the State's case in chief, a supervisor at the detention center testified that in November 2020, police were called in response to an assault at the center that did not involve Vazquez. Over a foundation objection, the supervisor testified that while police officers were at the center, he heard Vazquez yell, "'Hey, Officer, how is Officer Herrera?'" It is not disputed that by November 2020, Vazquez knew that Herrera had died. The supervisor testified that officers heard Vazquez' comment.

Vazquez was subsequently disciplined for the incident and wrote an apology letter. In it, Vazquez claimed that when the officers came to the center, he had actually yelled, "'R.I.P. Herrera'" because he thought the "cop looked at me in a mad way like I was being disrespectful towards them." When the supervisor was asked whether he heard Vazquez yell "anything about rest in peace," he replied, "No, he did not say that."

Once Vazquez turned 18 years old, he was transferred to the county jail pending trial, and he wrote a "goodbye" letter to staff at the juvenile detention center. That letter was admitted into evidence over defense counsel's objections based on foundation, speculation, relevance, and rule 403. On appeal, Vazquez challenges the admissibility of the first line of that letter, which stated, "Man as we all know I [am] in here for something the average person wouldn't do, but that doesn't describe the type of person I am."

All of the evidence described above was admitted over trial counsel's foundation and/or relevance objections, but Vazquez argues trial counsel performed deficiently by not also objecting to the evidence as improper character evidence under

rule 404. To the extent his appellate brief can also be read to argue prosecutorial misconduct based on introducing the same evidence, we do not address that argument because it was not both assigned and argued.[91] Instead, we address only his argument that trial counsel was ineffective, when objecting to this evidence, for failing to include an objection that it was improper character evidence under rule 404. And as we explain, we are not persuaded that such an objection would have been sustained.

[47] Vazquez' stepbrother testified that Vazquez never told him how he felt about police, and we see nothing about that testimony that plainly implicates Vazquez' character. As for testimony about the statement Vazquez yelled to police at the detention center and the "goodbye" letter he wrote to detention center staff, both were statements of Vazquez referring to the circumstances of the charged crime. And as we have already explained, comments by Vazquez tending to show a lack of remorse were admissible as probative circumstantial evidence that Vazquez shot at the officers purposely and with deliberate and premeditated malice.[92] As such, this evidence was not improper character evidence or other acts evidence subject to rule 404; rather, it was evidence that tended to logically prove an element of the crime charged. Finally, to the extent Vazquez' letter acknowledged that he was being detained for something the "average person wouldn't do," the statement can fairly be characterized as an admission showing consciousness of guilt, and that falls outside the scope of rule 404 too.[93]

Accordingly, the record affirmatively shows that trial counsel was not deficient in failing to object to any of this evidence as improper character evidence under rule 404.

---

[91] See *Goynes, supra* note 41 (only issues both specifically assigned and specifically argued on appeal will be considered by appellate court).

[92] See *Mowell, supra* note 18.

[93] See, generally, *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016) (holding statement made after murder was admission and direct evidence of charged crime not subject to rule 404(2)).

### (ii) Ross' Testimony

While Ross was testifying, the prosecution asked him whether he heard Herrera screaming in pain at the scene of the shooting. Vazquez' appellate brief asserts, without further explanation or discussion, that this question was "indefensible conduct."[94] We cannot tell whether this assertion is intended to present a claim of ineffective assistance of counsel or a claim of prosecutorial misconduct. But either way, the assertion is insufficiently alleged and argued, and we decline to address it further.[95]

### (iii) Body Camera Footage of Vazquez' Father

During the standoff, while other officers were in the residence attempting to coax Vazquez out of the bedroom, one officer stayed with Vazquez' stepmother, father, and other family members, all of whom were standing on the south side of the residence. Body camera footage from that officer was played at trial. The footage shows the family members patiently waiting for the standoff to resolve, and then the sound of broken glass and gunshots is heard. The video then depicts the father screaming obscenities and yelling for police to not kill his son. No objection was made to this portion of the video footage.

On appeal, Vazquez argues trial counsel was deficient for not moving to redact his father's outburst from the video footage. He generally contends it "amounted to bad character evidence against the father which had the potential of being misapplied to appellant."[96] We are not persuaded that an objection to this evidence on rule 404 grounds would have been

---

[94] Brief for appellant at 53.

[95] See, *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019) (assignment of error on direct appeal regarding ineffective assistance of counsel must specifically allege deficient performance); *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014) (mere conclusions of fact or law are not sufficient to support assignment of error).

[96] Brief for appellant at 53.

sustained. But regardless, we see no reasonable probability that, but for the admission of the video showing Vazquez' father yelling, the result of trial would have been different. As such, Vazquez cannot show actual prejudice under *Strickland*, and this claim fails as a matter of law.[97]

### (d) Failure to Object to
### Questions About Veracity

During trial, both parties introduced evidence bearing on the veracity of certain witnesses. On appeal, Vazquez contends that his trial counsel was ineffective in asking questions that elicited some of this evidence and in failing to object to questions by the State eliciting such evidence. In the sections that follow, we first summarize the questions and responses about which Vazquez complains. We then summarize his arguments, recite the applicable legal principles, and explain why his claims are meritless.

### (i) Trial Counsel's Questions

Both Ross and Vazquez were questioned by defense counsel about the gun used in the shooting. Ross testified that Vazquez stole the gun from Ross' stepfather's home while they were helping Ross' mother move out of that home. Ross testified that Vazquez first showed him the stolen gun when they stopped at a gas station during a road trip they took to Arkansas right after the move.

When questioning Vazquez, trial counsel asked, "You weren't entirely honest [during your interview after your arrest] were you?" to which he replied, "No." Defense counsel also asked Vazquez several questions about Ross' testimony. In response to these questions, Vazquez denied that he stole the gun and testified that it was Ross who stole it. Defense counsel then recounted Ross' testimony that Vazquez had shown him the stolen gun at a gas station and asked, "[W]as that accurate?" to which Vazquez answered, "[N]o, that wasn't accurate."

---

[97] See *Strickland, supra* note 37.

Defense counsel also asked Vazquez questions that elicited responses showing he agreed with some of Ross' testimony, including testimony that before the standoff, the stolen gun was brought to a "gender reveal" party, and that Ross fired the gun at a friend's house.

Defense counsel also asked Vazquez questions about Brown's trial testimony, focusing in particular on her testimony that before the shooting, Vazquez told her if he got "picked up" by law enforcement, "he would shoot at police, or try to kill them." Defense counsel asked Vazquez, "Did you say what she said you said?" and he replied, "No." Counsel also asked Vazquez about the detention supervisor's testimony, and Vazquez expressly denied shouting, "'How's Herrera?'"

### (ii) Prosecution's Questions

While the State was cross-examining Vazquez, the prosecutor summarized the testimony of Vazquez' stepbrother regarding events that occurred the night before the standoff, and then asked Vazquez, "That's not what happened?" Vazquez responded by providing additional details about what had occurred, stating that his stepbrother often "leave[s] some stuff out."

Vazquez was also asked about his interactions with the owner of the home where he was found hiding after the shooting. The following colloquy between the prosecutor and Vazquez occurred:

Q. Did [the homeowner] ever come back and say, "Hey, you got to get out there. They have the place surrounded"?

A. No, sir.

Q. So, he was mistaken when he said he came back and told you that a second time?

A. Yes, sir. He probably came to the window, and he probably saw that I wasn't there but.

Q. Well, that's not what he said —

A. Yeah, I know — I know what he said.

Q. —was it? You heard him testify, correct?

A. Yes, sir. Yes, sir.

Q. And he testified that he opened up the door, again, and said, "Hey, you got to get out of here. They're surrounding the place"?

A. Yes, I heard that.

Q. And he said that, correct?

A. No, sir. Not when he shut the door first.

Q. You heard him testify to that?

A. Yes, sir, I did.

Q. Was he incorrect when he testified to that?

A. Yes, sir.

The prosecutor asked Vazquez whether he had been honest with the police during his postarrest interview, and he said, "No." The prosecutor also asked Vazquez questions about the detention center supervisor's testimony, and Vazquez reiterated his belief that the supervisor's testimony was "wrong." Vazquez was also asked questions about Brown's testimony, and Vazquez reiterated that Brown was "incorrect" and was "not telling the truth" when she testified that Vazquez told her he would shoot at police if they tried to arrest him. Finally, in response to questions about his mother's testimony, Vazquez insisted that his mother had hit him with a belt and knocked his teeth out as a child, even though according to the prosecutor, she "said that didn't occur" and his dad did not "remember seeing any teeth." Vazquez testified that both of his parents were "incorrect" in this regard. Trial counsel did not object to any of these questions.

During closing, the prosecutor referred to Vazquez' testimony regarding the testimony of other witnesses, stating:

Vazquez, when he took the stand, he took the stand and he said [Brown], she's lying, although believe her when she says I was scared. My mom, she's lying. [Ross], he's lying. [The inmate], well, he's telling the truth, 'cause that's what I told him.

### (iii) Arguments and Legal Standards

On appeal, Vazquez argues that all the questions described above were improper attempts to elicit testimony about the credibility of other witnesses. He contends that his trial counsel was deficient for asking such questions and for failing to object when the State asked such questions. He argues that questions going to the veracity of other *witnesses* "invade the province of the jury, lack probative value, distort the prosecution's burden of proof, create 'no win' situations and are argumentative."[98] He does not explain how this testimony resulted in actual prejudice to his defense, although we acknowledge that on direct appeal, a defendant claiming ineffective assistance of trial counsel "need not also allege prejudice."[99]

[48,49] We have endorsed the general principle that it is "'improper for one witness to testify as to the credibility of another witness.'"[100] Similarly, we have held that it is improper for a prosecutor to inquire of a witness whether another person may or may not have been telling the truth.[101] But to date, we have not applied these propositions to limit a criminal defendant's testimony that he or she disagrees with the incriminating testimony of other witnesses.

Some jurisdictions, however, have adopted the general rule that asking a defendant to directly comment on the veracity

---

[98] Brief for appellant at 70.

[99] *Stelly, supra* note 23, 304 Neb. at 49, 932 N.W.2d at 871. See, also, *Filholm, supra* note 95 (holding no justification for requiring appellant to allege prejudice when claiming ineffective assistance of trial counsel on direct appeal).

[100] *State v. Archie*, 273 Neb. 612, 633, 733 N.W.2d 513, 530 (2007). See, also, *State v. Senteney*, 307 Neb. 702, 712, 950 N.W.2d 585, 592 (2020) (improper for investigator to testify regarding "indicators of deception" displayed by defendant during interview); *Rocha, supra* note 77 (investigator cannot comment on defendant's veracity during interview); *State v. Beermann*, 231 Neb. 380, 436 N.W.2d 499 (1989) (deputy cannot testify as to credibility of victim).

[101] *Archie, supra* note 100 (officer cannot testify she thought victim was being truthful).

of another witness is improper.[102] These jurisdictions generally hold that a defendant cannot be asked if another witness is "lying," "mistaken," "not telling the truth," or similar inquiries.[103]

However, there are also jurisdictions that allow, at least in some contexts, questions asking a defendant whether another witness was "wrong" or "mistaken,"[104] reasoning that such questions can merely "'highlight[] the objective conflict'" between the two witnesses.[105] Still other jurisdictions hold that

---

[102] See, e.g., *Liggett v. People*, 135 P.3d 725 (Colo. 2006) (improper to ask defendant whether another witness was lying); *State v. Maluia*, 107 Haw. 20, 23, 108 P.3d 974, 977 (2005) (improper to ask whether witnesses had any reason to "'make up a story'" against defendant); *Jensen v. State*, 116 P.3d 1088, 1097 (Wyo. 2005) (cannot ask if another witness is "'lying,'" "'not telling the truth,'" or "'mistaken'"); *State v. Santiago*, 269 Conn. 726, 850 A.2d 199 (2004) (improper to ask if all of State's witnesses were lying); *State v. Graves*, 668 N.W.2d 860, 867 (Iowa 2003) (improper to ask whether another witness "'made that up'"); *State v. Manning*, 270 Kan. 674, 19 P.3d 84 (2001) (improper to ask if other witnesses are lying); *Commonwealth v. Martinez*, 431 Mass. 168, 726 N.E.2d 913 (2000) (improper to ask if another witness was lying); *Burgess v. State*, 329 S.C. 88, 91, 495 S.E.2d 445, 447 (1998) (cannot "pit[]" one witness against another—no matter how question is phrased, cannot ask defendant to comment on truthfulness of another witness); *Knowles v. State*, 632 So. 2d 62 (Fla. 1993) (cannot ask defendant whether he thinks other witnesses were lying); *State v. Emmett*, 839 P.2d 781 (Utah 1992) (improper to ask if victim was lying); *State v. Casteneda-Perez*, 61 Wash. App. 354, 810 P.2d 74 (1991) (improper to ask if another witness told lie or was lying); *State v. Flanagan*, 111 N.M. App. 93, 97, 801 P.2d 675, 679 (1990) (improper to ask if another witness is "'mistaken'" or "'lying'"); *People v. Adams*, 148 A.D.2d 964, 539 N.Y.S.2d 200 (1989) (cannot ask if other testimony was lie); *People v. Riley*, 63 Ill. App. 3d 176, 379 N.E.2d 746, 19 Ill. Dec. 874 (1978) (improper to ask defendant if another witness was lying); *Mason v. State*, 449 S.W.2d 47 (Tex. Crim. App. 1969) (improper to ask if another witness is lying).

[103] See *id.*

[104] See, *U.S. v. Gaines*, 170 F.3d 72 (1st Cir. 1999); *U.S. v. Gaind*, 31 F.3d 73 (2d Cir. 1994).

[105] *Gaines, supra* note 104, 170 F.3d at 82.

the propriety of asking defendants questions about the veracity of other witnesses depends on the factual context.[106]

But this case does not require us to decide whether Nebraska will adopt a bright-line rule prohibiting all questions asking a defendant to comment on the veracity of another witness or whether we instead will permit such questions depending on how they are phrased or depending on the factual circumstances. Because, as we explain next, even assuming without deciding that counsel could be found deficient for asking, or failing to object to, questions that invited Vazquez to comment on the credibility or veracity of other witnesses, the record affirmatively shows that Vazquez cannot establish actual prejudice based on such alleged deficiency.

*(iv) Analysis*

All of the questions that Vazquez now claims his counsel was deficient for asking him were designed to give him an opportunity to dispute, under oath, some of the incriminating statements attributed to him by other witnesses. Setting aside whether the form of these questions was proper from an evidentiary standpoint, we can conceive of no way in which Vazquez was prejudiced by them, as the questions merely sought to elicit his version of events and impeach the credibility of adverse witnesses.

A similar analysis applies to many of the questions from the prosecutor that Vazquez now contends his trial counsel should have objected to as calling for improper testimony about the veracity of other witnesses. Most of the challenged

---

[106] See, *Southern Union Co. v. Southwest Gas Corp.*, 281 F. Supp. 2d 1117 (D. Ariz. 2003) (reasoning propriety of question may depend on context in which it is asked and finding one question about other witnesses' lying could have been phrased better but was not improper in context of case); *State v. Johnson*, 273 Wis. 2d 626, 681 N.W.2d 901 (2004) (veracity questions may aid jury with credibility determinations in some contexts); *State v. Pilot*, 595 N.W.2d 511, 518 (Minn. 1999) (agreeing with general rule prohibiting such questions but finding situations may warrant "'were they lying'" questions).

questions merely gave Vazquez another opportunity to dis-
agree with a version of events that was unfavorable to him.
And although several questions were phrased in a form that
invited Vazquez to comment on whether another witness was
"mistaken," "wrong," "incorrect," "not telling the truth," or
lying, the answers to those questions could easily have been
elicited through properly formed questions. Thus, it is possible
that defense counsel made a strategic decision not to object to
questions that gave Vazquez an opportunity to explain why he
disagreed with other witnesses' testimony.

But even assuming defense counsel could be found defi-
cient for failing to object to one or more of the questions as
calling for improper testimony about the veracity of another
witness, there is no reasonable probability that the result of
the proceeding would have been any different if objections had
been made and sustained to any of the prosecutor's questions
being challenged on appeal. That is so because in response to
a successful objection, the prosecutor could be expected to
simply rephrase the question in a way that elicited the same
information from Vazquez, but without asking him to comment
directly on the veracity of another witness. As a matter of law,
Vazquez cannot establish actual prejudice under *Strickland*
based on this claim of ineffective assistance of counsel.[107]

### (e) Failure to Properly Cross-Examine
### and Impeach Brown

Vazquez argues that his trial counsel was ineffective in
cross-examining Brown. More specifically, he contends that
counsel adduced testimony from Brown that was adverse to
him and that counsel failed to properly impeach Brown. We
address each argument in turn.

### *(i) No Adverse Testimony From Brown*

As noted, during her direct examination, Brown testified that
Vazquez told her, months before the shooting, that if he were

---

[107] See *Strickland, supra* note 37.

arrested, "he would shoot at police, or try to kill them. I don't know exactly what the words were." On cross-examination, the following testimony was adduced:

Q. And you're saying as part of this conversation, . . . Vazquez said something to the effect of he would shoot at police?

A. Yes.

Q. What were his exact words?

A. That if he was caught for prior incidents that he would shoot at police.

Vazquez argues that trial counsel was deficient in pursuing this line of questioning and should have left well enough alone. According to Vazquez, Brown's testimony on direct was "inexact" and from "the defense perspective that version of the conversation was as good as [Vazquez] could hope to achieve."[108] He argues that counsel's cross-examination effectively "changed the first vague statement to an exact and specific representation which the prosecution would rely upon thereafter as primary evidence of intent."[109]

We see no deficient performance in this line of questioning. First, the substance of Brown's testimony was the same on both direct examination and cross-examination; both times, she testified that Vazquez said he would "shoot at police" if he were picked up or caught. Moreover, it is not insignificant that, on cross-examination, when Brown was asked about Vazquez' "exact words," she did not repeat her earlier testimony that Vazquez said he would "try to kill" police. Particularly since a primary defense theory was that Vazquez intended to shoot to scare the police but did not intend to kill police, this line of cross-examination could be viewed as helpful to the defense. There is no merit to this claim of ineffective assistance.

---

[108] Brief for appellant at 86.

[109] Id.

### (ii) Brown Impeachment

Vazquez contends that because premeditation and intent were controverted issues at trial, it was critical to impeach Brown's credibility and call into question her testimony that Vazquez said he would "shoot at police" if he got arrested. He argues that trial counsel was deficient in failing to impeach Brown's credibility on three bases: impaired memory, pending criminal charges, and contradictory facts.

### a. Impaired Memory

Before trial, information was disclosed to defense counsel that Brown's sanity was evaluated in an unrelated criminal case. After learning this, defense counsel sought a ruling from the trial court allowing her to cross-examine Brown based on that evaluation. The court ruled that counsel could not "get into" any diagnosis of Brown made in the evaluation and could not refer specifically to the evaluation or any medical opinions expressed therein by the doctor who performed it. But the court told defense counsel she was free to "elicit other testimony" about the evaluation "as it goes to the witness's credibility."

While cross-examining Brown, trial counsel used a statement Brown made to a doctor during the evaluation to impeach her credibility and question her honesty. On appeal, Vazquez broadly contends there was additional information contained in the evaluation that trial counsel could have used to further impeach Brown's reliability as a historian, but he does not specifically allege what that information was. And he argues that counsel was ineffective in failing to make an offer of proof as to issues she was prevented from raising due to the district court's pretrial order, but he does not specifically identify those issues either.

To raise a claim of ineffective assistance on direct appeal, an appellant must make specific allegations of the conduct he or she claims constitutes deficient performance by trial counsel,

including facts supporting a basis for the deficiency.[110] We conclude that these allegations are conclusory, lack specificity, and merely assert that trial counsel could have done more. Because this claim of ineffective assistance was insufficiently raised, we do not address it further.

### b. Criminal Charges

Next, Vazquez argues that trial counsel was ineffective for failing to cross-examine Brown about criminal charges that were pending against her at the time of trial and whether those charges affected her testimony. Vazquez argues that such questioning was relevant to impeach Brown's credibility.

The record shows a criminal charge was filed against Brown in Lancaster County in March 2019. It also shows that during an August 31, 2020, interview with Brown, law enforcement discussed proposing an "offer" to Brown or "do[ing] some other things" for her. In light of that interview, the district court ordered the State to disclose to Vazquez "any benefit [Brown] received as a result of any statements she made."

Vazquez does not assert that Brown received any benefit from the State in exchange for her testimony against Vazquez, nor does he suggest that trial counsel knew of any such benefit. But he broadly contends that trial counsel was deficient for failing to cross-examine Brown about any benefits she received in exchange for her testimony against Vazquez.

Because nothing in the appellate record suggests that Brown was promised or received any sort of benefit for testifying, and because Vazquez does not allege specific facts to support any basis for questioning Brown about such a benefit, we again conclude Vazquez has failed to allege this deficient performance claim with sufficient specificity.[111]

---

[110] See, *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019); *Mrza, supra* note 95.

[111] *Id*.

### c. Contradictory Facts

Vazquez also argues trial counsel was ineffective in failing to impeach Brown based upon information Vazquez supplied to counsel. Among other things, Vazquez contends he told trial counsel that he was detained in a facility at the time he allegedly made the statement to Brown about shooting at police. We find this claim of ineffective assistance of counsel was adequately raised but the record is insufficient to resolve it on direct appeal.

### d. Failure to Object to Voir Dire

Vazquez alleges that trial counsel was ineffective for failing to object when the State used voir dire to "preview" juror's opinions of trial evidence. His claim is based on counsel's failure to object during the following questioning:

> [Prosecutor:] Okay. Now, sometimes people will testify and if they testify and they are charged with a crime they will have typically an agreement with the State to testify and in exchange they will get the benefit of whatever happens on their criminal charges.
>
> Does that make sense to everyone?
>
> PROSPECTIVE JURORS: Yes.
>
> [Prosecutor:] How do you feel about the testimony coming from the person that has that agreement with the State?
>
> . . . .
>
> PROSPECTIVE JUROR . . . : Not a big fan.
>
> [Prosecutor:] Not a big fan. Tell me why you're not a big fan.
>
> PROSPECTIVE JUROR . . . : So, the State gives immunity or some reduced sentence to somebody for their testimony. They get off from whatever they did, is that — is he — is that person giving their true testimony, or are they just trying to get out of hot water?
>
> [Prosecutor:] Okay. Whose job will it be to evaluate that issue, when that person testifies, do you know?

PROSPECTIVE JUROR . . . : No.

[Prosecutor:] Yeah, it would be the jury's decision to decide on issues of credibility. Issues of credibility come in all forms.

Children who are victims of sexual abuse testify and what are some of the issues of credibility for that child, anyone?

PROSPECTIVE JUROR: Memory.

[Prosecutor:] Memory.

PROSPECTIVE JUROR: Scare-age (phonetic).

[Prosecutor:] Scared.

PROSPECTIVE JUROR: Age.

[Prosecutor:] Yeah. So, all of those issues the jury applies to that witness and determines whether that statement, whether that testimony under oath is credible, and what weight to give it.

So, a person who is testifying with an agreement, you'll hear the terms and conditions of that agreement and then you'll be able to evaluate the credibility of that testimony in light of the agreement. And then assign weight to that testimony.

What are some of the ways that you could determine the credibility of that statement aside from the plea agreement that exists?

. . . .

PROSPECTIVE JUROR . . . : Are their accounts of the same nature, or the same incident, from other people who are not getting an agreement?

PROSECUTOR: All right, yeah.

. . . .

PROSPECTIVE JUROR . . . : Evidence.

PROSECUTOR: Yeah, the physical evidence. The witness testifies one way, and the physical evidence supports that version, that can be evidence that bolsters or assists the jury with making that credibility determination. Does that make sense?

[50,51] We have said that parties may generally ask hypothetical questions designed to determine whether prospective jurors' preconceived attitudes or biases would prevent them from following the law or applying a legal theory or defense.[112] But counsel may not use voir dire to preview prospective jurors' opinions of the evidence that will be presented.[113] Nor may counsel secure in advance a commitment from prospective jurors on the verdict they would return, given a set of hypothetical facts.[114] In sum, parties may not use voir dire to impanel a jury with a predetermined disposition or to indoctrinate jurors to react favorably to a party's position when presented with particular evidence.[115]

We addressed the proper use of voir dire in *Iromuanya*.[116] In that case, the defendant shot at and wounded one person, and the bullet struck and killed another. During voir dire, the prosecutor explained the legal theory of transferred intent and asked if anyone thought the theory was unfair as applied to a hypothetical scenario. The prosecutor did not reference any of the actual facts in the case, but he asked jurors to consider what sort of evidence would show intent, and he specifically asked whether any juror had training in the use of firearms and warning shots. When one prospective juror responded that his work protocol required firing a warning shot, the prosecutor remarked he thought that was a "'pretty good idea.'"[117]

In *Iromuanya*, we found the prosecutor's remarks about transferred intent were proper, but that it was improper to question jurors about what type of evidence would show intent and whether a warning shot should be fired, reasoning these questions were "clearly intended to persuade prospective

---

[112] *Iromuanya, supra* note 45.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.* at 815, 806 N.W.2d at 424.

jurors to the State's viewpoint of the evidence before they heard it."[118] We concluded, however, that although trial counsel should have objected to this prosecutorial misconduct, the record failed to show the defendant suffered prejudice as a result. In doing so, we relied on other evidence in the record that was generally very favorable to the State.

Other jurisdictions have addressed the propriety of discussing cooperation or plea agreements during voir dire. These jurisdictions have held that it is generally proper for a party to ask jurors if the existence of a plea agreement would affect their ability to assess the credibility of the witness.[119]

For example, in *State v. Smith*,[120] both the State and the defendant asked prospective jurors about their ability to objectively judge the credibility of witnesses testifying pursuant to cooperation agreements with the State. Specifically, jurors were asked by the State whether they thought the mere existence

---

[118] *Id*. at 817, 806 N.W.2d at 426.

[119] See, *U.S. v. Ortiz*, 315 F.3d 873, 896 (8th Cir. 2002) (holding "a potential juror's attitude towards immunized testimony is relevant, because it could help the parties exercise their peremptory challenges"); *Evans v. State*, 808 So. 2d 92, 106 (Fla. 2001) (inquiring "into whether any of the potential jurors would harbor any biases against a witness who had accepted a plea bargain"; proper when State did not bolster witnesses' credibility, but instead emphasized that jury needed to wait to view evidence presented at trial); *State v. Dudley*, 51 S.W.3d 44 (Mo. App. 2001) (holding proper for State to ask whether existence of plea agreement would affect jurors' ability to assess credibility of witness); *State v. Smith*, 46 Conn. App. 600, 700 A.2d 91 (1997) (holding proper for counsel to discuss in voir dire how cooperation agreement might affect assessment of credibility); *State v. Jones*, 347 N.C. 193, 491 S.E.2d 641 (1997) (holding permissible to ask voir dire questions to determine if jury can follow law and be impartial); *Hopkins v. State*, 429 N.E.2d 631, 635 (Ind. 1981) (holding voir dire could not be used to "implant in jurors' minds ideas about the substantive facts of the case being tried," but there was "nothing wrong in using voir dire to inquire into jurors' biases or tendencies to believe or disbelieve certain things about the nature of the crime itself or about the particular line of defense").

[120] *Smith, supra* note 119.

of the agreement meant that the witnesses would be lying, and they were asked by defense how the fact that a witness would benefit from an agreement would affect their assessment of credibility.[121] The court held these questions were proper, reasoning:

> The questions at issue in this case went directly to the prospective jurors' ability to assess the credibility of witnesses who would be called at trial. The questions were not attempts to elicit opinions from prospective jurors regarding how they would rule on a certain stated set of facts, or to condition them to prejudge pivotal issues that would affect the outcome of the trial. . . . [T]hese questions were proper, and the trial court was justified in allowing counsel to probe prospective jurors on their ability to assess witness credibility through the use of hypothetical questions . . . .[122]

And in *State v. Jones*,[123] the prosecutor told the jury a codefendant might testify at trial pursuant to a plea agreement and asked whether "'[t]he mere fact that there is some plea agreement, some plea bargain, . . . would that affect your decision or your verdict in this case?'" When the jurors responded no, the prosecutor asked whether they could "'listen to the court's instructions of how you are to view accomplice or interested witness testimony'" and "'follow the court's instructions?'"[124] He also asked, "'After having listened to that testimony and the court's instructions as to what the law is, and you found that testimony believable, could you give it the same weight as you would any other uninterested witness?'"[125] No objection was made by defense counsel.

---

[121] See *id.*

[122] *Id.*, 46 Conn. App. at 606, 700 A.2d at 95.

[123] *Jones, supra* note 119, 347 N.C. at 201, 491 S.E.2d at 646.

[124] *Id.* at 202, 491 S.E.2d at 646.

[125] *Id.*

On appeal, the defendant in *Jones* argued the voir dire questions were improper and the court should have sua sponte prohibited them. The appellate court disagreed, finding they were permissible questions "designed only to determine if prospective jurors could follow the law and serve as impartial and unbiased jurors."[126] The court emphasized that the questions (1) did not incorrectly or inadequately state the law, (2) were not an impermissible attempt to ascertain how a juror would vote on a given state of facts, and (3) sought to measure the ability of the jurors to be unbiased.[127]

Turning to the facts of this case, we note as a threshold matter that according to the appellate record, before asking any questions in voir dire about plea agreements, the State requested a sidebar to "clarify" what sort of questions would be permitted. It is unclear what was said by counsel during this sidebar, because the record contains a notation that the court reporter "could not hear Attorneys' voices." As such, the record does not affirmatively show that trial counsel failed to object, as Vazquez now appears to assert.

But even if Vazquez is correct that trial counsel failed to object to the voir dire questions inquiring about witnesses who have agreements with the State, we find no deficient performance. Counsel cannot be deficient for failing to object to questions that are permissible, and here, the prosecutor's questions related to juror attitudes about testimony based on plea agreements in general; the questions were not attempts to persuade prospective jurors to the State's viewpoint of the evidence. None of these questions related to the substantive facts of the case, or to any particular legal theory of the case. We see nothing in the voir dire questioning that can be characterized as incorrectly or inadequately stating the law or impermissibly attempting to ascertain how a juror would vote

---

[126] *Id.*, 347 N.C. at 204, 491 S.E.2d at 648.

[127] *Id.*

on a given set of facts. This claim of ineffective assistance has no merit.

### (f) Miscellaneous

Vazquez asserts several ineffective assistance of counsel claims that do not neatly fit into any prior category, and we address them here.

### (i) Opening Statement

Vazquez asserts that trial counsel provided ineffective assistance during opening statement. His entire argument is that the opening statement was deficient because:

> No theory of defense was presented. The jury was told the case was sad. The jury was told to keep an open mind. The jury was also told they would be presented with unlawful act manslaughter. There was no discussion of any evidence. There was no road map of what evidence will lead the jury to that lesser included offense. The statement concluded with a request to find [Vazquez] guilty of manslaughter.[128]

He broadly contends that counsel's opening statement reflected "insufficient advocacy in a case of first degree murder,"[129] but he does not explain why, nor does he identify what potential evidence or issues defense counsel should have discussed instead.

Even if we could find that some portion of this claim has been alleged with sufficient particularity, it is soundly refuted by the appellate record. Trial counsel's opening statement discussed the jury's role, the State's burden of proof, and the trial process. Counsel discussed the evidence in general terms, suggested there would be a lack of evidence showing premeditation and intent, and urged the jury to wait until it had heard all the evidence before making its decision.

---

[128] Brief for appellant at 80.

[129] Id.

We see nothing constitutionally deficient about trial counsel's opening statement. Instead, as Vazquez appears to concede in his appellate brief, counsel's approach to the opening statement was a matter of trial strategy, which is afforded due deference by appellate courts when reviewing claims of alleged ineffective assistance.[130] This claim is meritless.

### (ii) Evidence of Force Used to Arrest Vazquez

Vazquez claims that trial counsel was ineffective for failing to object to "an accumulation of evidence" that "law enforcement had committed a large number of officers" and a "heavy amount of lethality" to his arrest.[131] His only argument in support of this claim, however, is that trial counsel should have objected to the admission of drone footage of Vazquez' actual arrest. We therefore limit our analysis of this claim to only that evidence.[132]

The drone footage is approximately 5 minutes long and has no audio. It provides an overhead view of Vazquez' surrender and begins with Vazquez' standing with his arms in the air outside the enclosed porch where he was found hiding. A black armored vehicle with "Lancaster County Sheriff" written on the side is parked in the yard, approximately 20 feet from Vazquez, and an officer with an assault rifle can be seen in the open roof of the armored vehicle. While 2 officers take Vazquez to the ground and handcuff him, 10 or so other officers keep their weapons aimed at the porch area. The drone then approaches the porch area and views inside; the drone operator testified this was done to confirm there was no one else hiding there.

Vazquez argues that trial counsel was deficient for failing to object to the drone footage "as irrelevant and if overruled

---

[130] See *Garcia, supra* note 43.

[131] Brief for appellant at 80.

[132] See *Goynes, supra* note 41.

as unduly prejudicial and cumulative under [r]ule 403."[133] He presents no argument that the drone footage was irrelevant, and we see none, so we focus on his argument that it should have been excluded under rule 403.

He contends the drone footage was unnecessarily cumulative because one of the arresting officers had already testified about the arrest and the jury had already seen that officer's body camera footage of the arrest. Vazquez argues the drone footage was unduly prejudicial because it was "an unnecessary display of the ominous presence of a dozen heavily armed officers outfitted in battle dress uniforms including helmets, a police canine, and a massive black armored personnel carrier."[134] According to Vazquez, the drone footage allowed the State "to amplify the theme that police believed [Vazquez] was dangerous."[135]

The record is sufficient to both address and reject this claim of ineffective assistance. As we will explain, objections to the admissibility of the drone footage on the basis of rule 403 would have been overruled.

Before addressing rule 403, we acknowledge that trial counsel may have had sound strategic reasons for not objecting to the drone footage. Although it shows a strong police response to the shooting, it also shows that Vazquez was compliant, did not fire additional shots at the officers, and did not resist being taken into custody. Vazquez acknowledges that his counsel may have made a tactical decision not to object to this evidence, but we ultimately find it unnecessary to consider that issue. Because regardless of defense strategy, we are persuaded the drone footage would have been admitted over a rule 403 objection.

Although one of the arresting officers had already testified about the arrest and his body camera footage was admitted,

---

[133] Brief for appellant at 80.

[134] *Id*. at 81.

[135] *Id*. at 31.

the drone footage of the event provided a more comprehensive view of the crime scene and the area where Vazquez was discovered and arrested. The admission of the drone footage was thus not unnecessarily cumulative. And to the extent the drone footage depicted a heavy police presence at the scene, which we understand to be the thrust of Vazquez' argument that the footage was unfairly prejudicial, the relevance of the footage was not outweighed by the danger of unfair prejudice.

The large officer presence and the conduct of those officers was a direct response to Vazquez' actions and the danger he posed. He barricaded himself inside a residence to avoid arrest on a felony warrant, he shot at and injured police while attempting to escape, and then, still armed with a gun, he ran into a residential neighborhood and hid from law enforcement. As we have often said, "[T]he State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing."[136] We see nothing about the drone footage that would tend to suggest a decision based on an improper basis or would "lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged."[137] Because a rule 403 objection to this evidence would have been overruled, counsel was not deficient for failing to make such an objection.

#### (iii) Testimony Adduced Regarding Ross

Vazquez argues that trial counsel was ineffective, when cross-examining the officer who arrested Ross, for adducing the following testimony:

> Q. It was fairly salty language that you used when you spoke with . . . Ross, is that correct?
> A. Yes.
> Q. And isn't it true that you said, "Where the fuck is the gun?"

---

[136] *State v. Rush*, 317 Neb. 622, 660, 11 N.W.3d 394, 427 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787.

[137] *Id.* at 661, 11 N.W.3d at 428.

A. I believe so, yes.

Q. And . . . Ross responded what?

A. He didn't have the gun.

Q. Okay. Did he say, "If I'd had a gun I wouldn't have been running"?

A. Yes.

Although Vazquez does not point it out, the record shows the officer later clarified that Ross actually said, "[I]f I had a gun[,] I wouldn't have stopped running."

Vazquez argues that by adducing this testimony, trial counsel permitted the jury to make an adverse inference that "a person with a gun would use that gun intentionally and initiate a firefight."[138] We cannot agree that a reasonable juror would infer anything from this testimony about whether Vazquez intentionally shot at officers. The testimony was not related to Vazquez at all. Nor does Vazquez point to anything in the record suggesting that this testimony was somehow used at trial, or referenced in closing argument, to suggest that Vazquez intentionally shot at officers. Trial counsel did not perform deficiently by adducing this testimony.

### (iv) Unreasonable Advice About Right to Testify

Vazquez claims his trial counsel was ineffective when advising him whether to exercise his right to testify at trial. He alleges that trial counsel did not adequately explain the advantages and disadvantages of testifying, did not tell him what kind of questions to expect on direct examination or cross-examination, and did not "rehearse"[139] with him. Both Vazquez and the State suggest the record on appeal is insufficient to resolve this claim. We agree.

Although the record shows that Vazquez was advised by the court of his right to testify and not to testify, and it also shows that Vazquez consulted with counsel about these rights

---

[138] Brief for appellant at 87.

[139] *Id*. at 88.

before advising the court he had decided to testify, the record is understandably silent as to the nature of counsel's advice. This claim has been sufficiently raised, but the record on direct appeal is not sufficient to resolve it.

### (v) Questions About Employment Status

Vazquez claims his trial counsel was ineffective for failing to object when the State asked about his employment status. The argument is based on the following cross-examination testimony:

> Q. And I wasn't sure, I believe . . . Ross testified that when [you] were [with him] in [Arkansas] he was working, is that correct?
>
> A. Yes, sir. That's correct.
>
> Q. And were you working?
>
> A. No sir. I was trying to find a job though.
>
> Q. So, when you weren't working you were staying at home?
>
> A. Yes, sir.

Vazquez argues that his employment status was not a fact of consequence and that these questions were asked to "inflame the emotions of the jury against"[140] him based on his unemployment. He generally contends this testimony should have been objected to under rules 401 and 403.

Even assuming for the sake of argument that objections to this line of questioning would have been sustained, there is no reasonable probability that, but for the testimony about employment status, the outcome of the proceeding would have been different. Vazquez cannot establish prejudice under *Strickland,* and there is no merit to this claim.[141]

### (vi) References to Gang Membership

Vazquez' stepbrother testified at trial. During his direct examination, he testified that he had entered into plea

---

[140] *Id.* at 89.

[141] See *Strickland, supra* note 37.

agreements with both State and federal prosecutors. His written plea agreement with the State was admitted into evidence, as were both the State and federal proffer letters. Trial counsel did not object. The federal proffer letter states in part that the stepbrother agreed to reveal "everything [known] about violations of federal and state law committed by members of the No Name Demons gang and . . . the homicide investigations and prosecutions concerning [Vazquez]."

During the cross-examination of Vazquez, the prosecutor asked for the screen name Vazquez used to communicate on social media during the standoff, and he answered, "[S]omething like, you know, no dot murder dot no names." Trial counsel did not object to this testimony.

On appeal, Vazquez argues that trial counsel was ineffective in failing to object to the response about Vazquez' screen name and in failing to redact information about gang activity from the stepbrother's federal proffer letter. He contends these deficiencies allowed the jury to know of Vazquez' gang affiliation and were "so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error."[142]

We find no deficient performance. Both references to gang affiliations were fleeting and indirect. And although the prosecution and defense both knew Vazquez had connections to the "No Name Demons" gang, the jury did not know of these connections. As such, the reference to that gang in the stepbrother's proffer letter was not something the jury would necessarily presume related to Vazquez. Indeed, the language in the proffer letter can be read to refer to two different matters— the first being testimony related to the gang, and the second being testimony related to Vazquez. Similarly, Vazquez' mere recitation of his screen name was not something the jury would presumptively equate with a gang affiliation.

---

[142] Brief for appellant at 76.

On this record, we conclude that any arguable connection between Vazquez and evidence of potential gang affiliation was so attenuated that trial counsel was not deficient in failing to object.

### (vii) Attorney Work Product

Vazquez claims his trial counsel was deficient in failing to "[s]afeguard" her attorney work product. According to Vazquez, counsel gave him trial preparation materials to review while he was in custody, and those materials eventually "came into the possession of" Ross.[143] Vazquez does not allege how, when, or why that occurred, nor does he describe the nature of the materials except to broadly allege they "included the questions trial counsel intended to ask of the witnesses."[144]

Vazquez asserts that his attorney was aware of the privacy risks associated with providing these materials to him while he was in jail. He asserts counsel was "deficient by providing [him] with those notes,"[145] but he does not explain what steps counsel should have taken to safeguard the materials, either before or after providing them to him. He also claims that when counsel "eventually learned that the work product came into the possession of . . . Ross," she was deficient in failing to "ascertain how many people had access" to the notes and in failing "to request that the work product be returned if an unintended disclosure had occurred."[146] Vazquez does not actually allege that any unintended disclosure of privileged information occurred, but he speculates "the potential for harm was great."[147]

To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that

---

[143] *Id.* at 78.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

of a lawyer with ordinary training and skill in criminal law.[148] Vazquez does not cite to a single case, from this jurisdiction or any other, for the proposition that an attorney is constitutionally deficient if he or she provides trial preparation materials to a client who is incarcerated. But even assuming without deciding that facts could be alleged showing that such conduct is deficient under certain circumstances, Vazquez' vague and uncertain allegations fall far short of the specificity required to raise such a claim. At most, he has alleged facts showing that his counsel provided him with some trial preparation materials and that his counsel was not concerned after learning those materials may have been disclosed. These facts might support a reasonable inference that counsel did not think the materials were particularly critical to the defense, but they do not show deficient performance.

### (g) Sentencing

Finally, Vazquez claims that trial counsel was ineffective in connection with his sentencing. He points to the fact that he "received an aggregate sentence of 129 years to life imprisonment"[149] for the seven convictions in this case, and he argues that "trial counsel performed deficiently by not providing the court . . . with the necessary data and argument to adequately apply the decisional and statutory authorities that were controlling."[150] When he refers to controlling authority, we understand Vazquez to be referring to Neb. Rev. Stat. § 28-105.02 (Reissue 2016) and to *Miller v. Alabama*.[151] We limit our analysis accordingly.

In *Miller*, the U.S. Supreme Court held that a criminal defendant under the age of 18 cannot constitutionally be

---

[148] *State v. Assad*, 304 Neb. 979, 938 N.W.2d 297 (2020).

[149] Brief for appellant at 89.

[150] *Id*. at 90.

[151] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

sentenced to a mandatory term of life imprisonment without parole. In light of the holding in *Miller*, our cases hold that "a sentencer must consider specific, individualized factors before handing down a sentence of life imprisonment without parole for a juvenile."[152] In response to *Miller*, the Nebraska Legislature enacted § 28-105.02, which provides that the sentencing range for a person convicted of a Class IA felony who is under 18 years of age "shall be a maximum sentence of not greater than life imprisonment and a minimum sentence of not less than 40 years' imprisonment." Section 28-105.02 also mandates a list of mitigating factors that courts must consider when imposing sentence. Because Vazquez' conviction for first degree murder is a Class IA felony, his sentence was governed by § 28-105.02.

The court's sentencing remarks confirm that it considered both *Miller* and the mitigating factors under § 28-105.02 when imposing sentence. The court stated:

> Having regard for the nature and circumstance of the crime, the history, character and condition of [Vazquez], and all relevant — and all other relevant factors, including the age, mentality, education and experience, social and cultural background, past criminal record, motivation for the offense, nature of the offense, amount of violence involved, impetuosity of [Vazquez], family and community environment, his ability to appreciate the risks and consequences of his conduct, his intellectual capacity, and the mental health evaluation, and including all the factors set forth in *Miller v. Alabama*, *Graham v. Florida*, and *Jones v. Mississippi*, and all of the mitigating factors set forth in Neb. Rev. Stat. Section 28-105.02, the Court finds that imprisonment of [Vazquez] is necessary for the protection of the public, because the risk is substantial that, during any period of probation, he would engage in additional criminal conduct, and a

---

[152] *State v. Mantich*, 287 Neb. 320, 340, 842 N.W.2d 716, 730 (2014).

lesser sentence would depreciate the seriousness of his crimes and promote disrespect for the law.

The court then sentenced Vazquez to imprisonment for not less than 70 years and not more than life on the first degree murder conviction, a term well within the statutory sentencing range under § 28-105.02.

We do not understand Vazquez to argue that the trial court erred by imposing an excessive sentence or that the court failed to properly consider either *Miller* or the mitigating factors under § 28-105.02. Instead, he argues that trial counsel was deficient for not specifically mentioning *Miller* in her sentencing remarks and for "fail[ing] to present adequate evidence"[153] to the court on adolescent brain development. The record affirmatively refutes this claim.

Prior to sentencing, trial counsel referred Vazquez to a licensed psychologist for a comprehensive mental health evaluation as contemplated by § 28-105.02(f). The 23-page report of that evaluation was submitted for inclusion in the presentence investigation report and was considered by the sentencing court. Because the contents of presentence investigation reports are privileged,[154] we will not quote directly from the psychologist's report. However, as relevant to this claim, the report contained an exhaustive discussion of the current scientific literature on neuropsychological brain development, including the law that has developed around that science, and then applied those concepts to Vazquez.

Moreover, trial counsel made both oral and written sentencing remarks to the court. Each focused heavily on the fact that Vazquez was a juvenile when these crimes were committed, emphasized the law on developing juvenile brains, and addressed the ways in which Vazquez' impulse control and decisionmaking were impacted by his young age.

---

[153] Brief for appellant at 91.

[154] See Neb. Rev. Stat. § 29-2261 (6)(a) (Cum. Supp. 2024).

Because the record affirmatively shows that trial counsel presented the court with argument specifically addressing the relevant factors under both *Miller* and § 28-105.02, and with specific information about Vazquez relating to both, there is no merit to this claim of ineffective assistance.

## V. CONCLUSION

For the foregoing reasons, we conclude that all of Vazquez' assignments of error lack merit and that his claims of ineffective assistance of trial counsel either lack merit, were not raised with sufficient specificity, or cannot be resolved on direct appeal. We therefore affirm his convictions and sentences.

Affirmed.

Heavican, C.J., not participating in the decision.